**LOUIS DREYFUS NEGOCE S.A., Petitioner,**

v.

**BLYSTAD SHIPPING & TRADING, INC., Respondent.**

**No. 99 CIV. 11128(SAS).**

United States District Court, S.D. New York.

Feb. 29, 2000.

David A. Nourse, Shaun F. Carroll, Nourse & Bowles, LLP, New York City, for Louis Dreyfus Negoce S.A.

Simon Harter, Healy & Baillie, LLP, New York City, for Blystad Shipping & Trading, Inc.

### OPINION AND ORDER

SCHEINDLIN, District Judge.

Petitioner Louis Dreyfus Negoce S.A. ("Dreyfus") moves this Court, pursuant to the United States Arbitration Act, 9 U.S.C. § 1 et seq., and the Declaratory Judgment Act, 28 U.S.C. § 2201, for an order: (1) declaring that the claim brought by respondent Blystad Shipping & Trading Inc. ("Blystad") against Dreyfus is not subject to arbitration in New York; (2) staying any further proceedings in the pending New York arbitration; and (3) enforcing a choice of law/choice of forum provision stipulating that Blystad's claim must be brought in London. For the reasons set forth below, Dreyfus' motion is denied.

## I. BACKGROUND

### A. Facts

On November 27, 1996, Blystad and Dreyfus entered into a tanker voyage charter party (the "Charter"), providing for the carriage of a shipment of crude degummed soyabean oil from the United States to China. See Affidavit of Clifford A. Dahl, Assistant Chartering Manager at Dreyfus ("Dahl Aff."), ¶ 2. Blystad was the time charterer of a vessel known as the M.T. THORSFREDDY (the "Vessel"), owned by Jahre Dahl Bergesen ("Bergesen"). See id.; Affidavit of David Nourse, counsel for Dreyfus ("Nourse Aff."), Ex. C. Dreyfus intended to sell the soyabean oil to Lief Enterprise Pty Ltd. ("Lief"), which intended to sell it to Kaland Limited ("Kaland"). See Nourse Aff., ¶¶ 2, 11.

The Charter provided that the Vessel would pick up the soyabean oil at Brownsville, Texas, and New Orleans, Louisiana, and discharge it at "One (1) safe berth each/One (1)/Two (2) safe port(s) CHINA;" the Charter did not specify the discharge port in China. See Dahl Aff., Ex. B, Cl. C. In December 1996, the soyabean oil was loaded onto the Vessel at Brownsville and New Orleans. See Dahl Aff., ¶¶ 8, 9; Nourse Aff., ¶ 4. Pursuant to instructions received from Lief, tanker bills of lading providing that the soyabean oil should be discharged at Qingdao, China, were issued. See Nourse Aff., ¶ 4; Dahl Aff., ¶ 9, Exs. C, D.

On or about January 13, 1997, as the Vessel was approaching China, Blystad advised that the Vessel was expected to arrive at Qingdao on January 18, but that the original bills of lading had not yet arrived. See Nourse Aff., ¶ 5; Dahl Aff., ¶ 12. Blystad requested that Dreyfus arrange for a letter of indemnity from the receivers of the soyabean oil, so that the Vessel might discharge the soyabean oil on its arrival in Qingdao without waiting for presentation of bills of lading. See id. Blystad provided Dreyfus with a form letter of indemnity; Dreyfus forwarded this form letter to Lief. See Nourse Aff., ¶ 5; Dahl Aff., ¶ 13.

On or about January 15, 1997, Lief advised Dreyfus that Kaland, the ultimate buyer, had requested that the discharging port be changed to Qin Huang Dao, China.

*See* Nourse Aff., ¶ 6; Dahl Aff., ¶ 13. The Charter contained a provision specifically related to a change in the discharge port; that provision states, in relevant part:

> [T]he Charterer warrants that the cargo shall be discharged at the ports and berths specified in Part I. Any change in loading or discharging ports or berths shall be made only as the result of special agreement in writing between Charterer and Owner, and in such case, Charterer shall assume all cost incident to such change, including the value of the vessel's time if the voyage is prolonged thereby.

Dahl Aff., Ex. B, Cl. 6(c). Dreyfus relayed Kaland's request to Blystad and indicated that letters of indemnity regarding the change of destination and the discharge of cargo without the presentation of the original bills of lading would be issued by both Lief and Dreyfus. *See* Nourse Aff., ¶ 6; Dahl Aff., ¶ 13. Blystad advised Dreyfus that the Vessel's expected arrival date in Qin Huang Dao was January 18 and requested that the letters of indemnity be forwarded. *See* Nourse Aff., ¶ 6; Dahl Aff., ¶ 13.

On or about January 20, 1997, Dreyfus received two letters of indemnity from Lief. *See* Nourse Aff., ¶ 7; Dahl Aff., ¶ 16. These letters of indemnity were typed on Lief's letterhead, signed on its behalf, and dated January 17 and 20, 1997; they were in the form provided by Blystad and were addressed to Blystad, as "owners," and Dreyfus, as "charterers." *See* Nourse Aff., ¶ 7; Dahl Aff., ¶ 16, Ex. K. Dreyfus endorsed both letters of indemnity by adding its name, address, and signature on the second page of each letter and then superimposing a copy of the text of the letters, thus endorsed, upon Dreyfus' letterhead. *See* Nourse Aff., ¶ 8; Dahl Aff., ¶ 17, Ex. L. Dreyfus then forwarded these endorsed letters of indemnity to Blystad, which confirmed that the letters were in order and that the Vessel had been instructed to discharge the soyabean oil without delay. *See* Nourse Aff., ¶ 8; Dahl Aff., ¶ 18.

The letters of indemnity state, in relevant part:

> In consideration of your complying with our above request we hereby agree as follows:
>
> 1. To indemnify you, your servants and agents and to hold all of you harmless in respect of any liability, loss or damage of whatsoever nature which you may sustain by reason of delivering the goods to China Ocean Shipping Agency, Qin Huang Dao in accordance with our request.
>
> 2. In the event of any proceedings being commenced against you or any of your servants or agents in connection with the delivery of the goods as aforesaid, to provide you or them from time to time with sufficient funds to defend the same.
>
> 3. If the vessel or any other vessel or property belonging to you should be arrested or detained or if the arrest or detention thereof should be threatened, [in connection with the delivery of the goods as aforesaid,] to provide such bail or other security as may be required to prevent such arrest or detention or to secure the release of such vessel or property and to indemnify you in respect of any loss, damage or expenses caused by such arrest or detention whether or not the same may be justified.
>
> 4. As soon as all original Bills of Lading for the above goods shall have arrived and/or come into our possession, to produce and deliver the same to you [or to your agents at Port of Discharge] whereupon our liability hereunder shall cease [immediately].
>
> 5. The liability of each and every person under this indemnity shall be joint and several and shall not be conditional upon your proceeding first against any person, whether or not such person is party to, or liable under, this indemnity.
>
> 6. This indemnity shall be construed in accordance with English Law and each and every person liable under this in-

demnity shall, at your request, submit to the jurisdiction of the High Court of Justice of England.

Dahl Aff., Exs. K, L.[1]

After discharging the soyabean oil at Qin Huang Dao, the Vessel was arrested by order of the Tianjin Maritime Court. *See* Nourse Aff., ¶ 9. The Vessel remained under arrest for about three months. *See id.* Following its release, the Vessel discharged a second parcel of soyabean oil at Shantou, China, and then left China. *See id.*

### B. Procedural History

On March 5, 1997, Blystad commenced an action against Dreyfus and Lief in the High Court of Justice, Queens Bench Division, Commercial Court, in London (the "London High Court"). *See* Nourse Aff., ¶ 10; Unsworn Declaration Under Penalty of Perjury of Stephen Kirkpatrick, counsel for Dreyfus in London ("Kirkpatrick Decl."), ¶ 2. In its Writ of Summons, Blystad described its claim as follows:

The Plaintiffs' claim is for damages for breach of a contract contained in and/or evidenced by a letter from the Defendants to the Plaintiff dated 20th January 1997 in failing to provide such bail or security required to prevent the arrest of, and/or secure the release from arrest of, the vessel "THORSFREDDY" at Qing [sic] Huang Dao, China, in January 1997, and/or for an indemnity pursuant to the terms of the contract in respect of liability, loss and damage suffered by the Plaintiffs as a result of the arrest of the vessel and/or as a result of the Plaintiffs complying with the Defendants' request for the vessel to proceed to Qin Huang Dao (instead of Qingdao) and/or the Defendants' request for cargo to be delivered to Chua [sic] Ocean Shipping Agency, and/or for specific performance of the contract.

Kirkpatrick Decl., Ex. A.

Little more than a week later, on March 13, 1997, Blystad sent Dreyfus a letter demanding "arbitration of Blystad's claims for breach of charter in connection with the discharge of a cargo of soyabean oil at Qin Huang Dao, China," pursuant to the arbitration clause contained in the Charter. *See* Nourse Aff., ¶ 12, Ex. A. The Charter's arbitration clause states:

Any dispute arising from the making, performance or termination of this Charter Party shall be settled in New York, Owner and Charterer each appointing an arbitrator, who shall be a merchant, broker or individual experienced in the shipping business; the two thus chosen, if they cannot agree, shall nominate a third arbitrator who shall be an Admiralty lawyer. Such arbitration shall be conducted in conformity with the provisions and procedure of the United States Arbitration Act, and a judgment of the Court shall be entered upon any award made by said arbitrator. Nothing in this clause shall be deemed to waive Owner's right to lien on the cargo for freight, dead freight or demurrage.

Dahl Aff., Ex. B, Cl. 31. The dispute between Dreyfus and Blystad then proceeded along the parallel tracks of litigation in London and arbitration in New York.

On or about March 18, 1997, Dreyfus appeared in the London High Court to defend Blystad's claim; Lief appeared on April 18, 1997. *See* Kirkpatrick Decl., ¶ 3. On April 18, 1997, Blystad served its Points of Claim against both Dreyfus and Lief. *See id.* ¶ 4.[2] In late May 1997, both Dreyfus and Lief served their Points of Defence against Blystad; Dreyfus also

---

1. Exhibit K is the letter of indemnity dated January 17, 1997; Exhibit L is the letter of indemnity dated January 20, 1997. The bracketed portions appear only in Exhibit L.

2. On or about June 11, 1997, Blystad served an amended copy of its Points of Claim on Dreyfus and Blystad, adding a claim based upon the letter of indemnity dated January 17, 1997. *See* Kirkpatrick Decl., ¶ 4.

filed an indemnity claim against Lief. *See id.*, ¶¶ 5–7; Nourse Aff., ¶ 11. On or about June 20, 1997, Blystad served Voluntary Particulars on Dreyfus and Lief. *See* Kirkpatrick Decl., ¶ 8. On or about July 15, 1997, Lief filed an indemnity claim against Kaland, which appeared to defend the claim on August 1, 1997. *See id.*, ¶ 9; Nourse Aff., ¶ 11. The London High Court action is still pending. *See* Kirkpatrick Decl., ¶ 10; Nourse Aff., ¶ 11.

Back in New York, Blystad renewed its demand for arbitration on November 18, 1997. *See* Nourse Aff., ¶ 13. On December 8, 1997, Dreyfus responded to Blystad's renewed demand, appointing an arbitrator but stating that the appointment was "without prejudice to Dreyfus' position that the issues which Blystad seeks to arbitrate in New York may be subject to the litigation which Blystad has commenced" in the London High Court. *See id.*, ¶ 14. There have not been any proceedings in the New York arbitration. *See id.*, ¶ 15; Affidavit of Simon Harter, counsel for Blystad ("Harter Aff."), ¶ 8.

Finally, on November 5, 1999, Dreyfus moved this Court for an order: (1) declaring that Blystad's claim for indemnity against Dreyfus is not subject to arbitration in New York; (2) staying the arbitration between Dreyfus and Blystad in New York; and (3) enforcing the choice of law/ choice of forum clause contained in the letters of indemnity. Blystad opposes this motion, arguing that its claim against Dreyfus is subject to arbitration in New York.[3]

## II. DISCUSSION

The parties agree that the Charter contains a valid arbitration clause. Their disagreement involves the scope of that clause and, more specifically, whether the clause applies to the claims asserted by Blystad. The Second Circuit Court of Appeals has laid out some general principles

for determining the scope of an arbitration clause:

> Federal arbitration policy respects arbitration agreements as contracts that are enforceable in the same way as any other contract.... Federal policy strongly favors arbitration as an alternative dispute resolution process. We are instructed that any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration. Accordingly, federal policy requires us to construe arbitration clauses as broadly as possible. We will compel arbitration unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.
>
> These are rules of construction, however, and what we construe is a contract. Accordingly, federal law does not require parties to arbitrate when they have not agreed to do so. Federal law simply requires courts to enforce privately negotiated agreements to arbitrate, like other contracts, in accordance with their terms.

*Collins & Aikman Products Co. v. Building Systems, Inc.*, 58 F.3d 16, 19–20 (2d Cir.1995) (quotation marks and citations omitted).

In addition to these general principles, the Second Circuit has provided a roadmap for analyzing whether Blystad's claims are arbitrable. First, "a court should decide at the outset whether the arbitration agreement is broad or narrow." *Id.* at 20 (quotation marks and citation omitted).

> [I]f the arbitration clause is broad, there arises a presumption of arbitrability; if, however, the dispute is in respect of a matter that, on its face, is clearly collateral to the contract, then a court should test the presumption by reviewing the allegations underlying the dispute and by asking whether the claim alleged implicates issues of contract construction

---

**3.** Although Blystad requested oral argument or an evidentiary hearing, these appear to be unnecessary, given the thorough briefing and the arguments at the pre-motion conference and at a subsequent telephone conference.

or the parties' rights and obligations under it. If the answer is yes, then the collateral dispute falls within the scope of the .arbitration agreement; claims that present no question involving construction of the contract, and no questions in respect of the parties' rights and obligations under it, are beyond the scope of the arbitration agreement.

*Id.* at 23. A court should apply the same test "[i]f an arbitration clause is narrowly worded and the dispute concerns a matter collateral to the contract calling for arbitration." *WorldCrisa Corp. v. Armstrong*, 129 F.3d 71, 74–75 (2d Cir.1997).

### A. Is the Charter's Arbitration Clause Broad or Narrow?

The Charter's arbitration clause covers "[a]ny dispute arising from the making, performance or termination" of the Charter. *See* Dahl Aff., Ex. B, Cl. 31. Dreyfus argues that the clause is narrow; Blystad contends that it is broad. The Second Circuit has explained that, in determining whether an arbitration clause is broad or narrow, "[s]pecific words or phrases alone may not be determinative although words of limitation would indicate a narrower clause. The tone of the clause as a whole must be considered." *Prudential Lines, Inc. v. Exxon Corp.*, 704 F.2d 59, 64 (2d Cir.1983); *see also McDonnell Douglas Finance Corp. v. Pennsylvania Power & Light Co.*, 858 F.2d 825, 832 (2d Cir.1988) ("In construing arbitration clauses, courts have at times distinguished between 'broad' clauses that purport to refer all disputes arising out of a contract to arbitration and 'narrow' clauses that limit arbitration to specific types of disputes.").

The best approach in this case is the one taken by the Second Circuit in *WorldCrisa*, where it explained:

The arbitration clause at issue here does not contain the typically broad language that makes arbitrable all disputes 'arising out of' or 'related to' the contract or its breach. On the other hand, the clause is by no means narrow. It is not necessary to make the nice determination of exactly where in the range between broad and narrow this clause fits. The clause is close enough to the 'broad' end of the spectrum to justify a presumption of arbitrability here. Moreover, we believe that even without resort to the presumption the current dispute falls within the scope of the arbitration clause.

*WorldCrisa Corp.*, 129 F.3d at 75; *see also Rochdale Village, Inc. v. Public Service Employees Union*, 605 F.2d 1290, 1296 (2d Cir.1979) ("The arbitration clause in the collective bargaining agreement between Rochdale and the Union is broad, but it is not unlimited."); *Cleveland Wrecking Co. v. Iron Workers Local Union*, 947 F.Supp. 745, 748 (S.D.N.Y.1996) (stating that arbitration clause at issue was "broad, but not unlimited"). As demonstrated below, it is not necessary to state unequivocally whether the Charter's arbitration clause is broad or narrow, because Blystad's claims fall within the scope of that clause, even without the presumption of arbitrability.

### B. Do Blystad's Claims Arise Under a Collateral Agreement?

■ Next, the Court must determine whether Blystad's claims arise under the Charter itself or under a collateral agreement. This determination involves two steps: (1) whether the letters of indemnity are collateral agreements to the Charter; and (2) whether Blystad's claims arise under the Charter or under the letters of indemnity.

#### 1. Are the letters of indemnity collateral agreements to the Charter?

The Second Circuit has explained the relevant inquiry:

A 'collateral' agreement is a separate, side agreement, connected with the principal contract which contains the arbitration clause. The burden is on the party resisting arbitration to demonstrate that the disputed issue is collateral.

If a dispute arises under a collateral agreement, arbitration of that dispute

cannot be compelled merely based upon the existence of an arbitration clause in the main agreement.

It is important to note the difference between a dispute arising under a collateral agreement and one which arises under the main agreement but requires determination of a sub-issue. The latter ... is one which is inextricably tied up with the merits of the underlying dispute, ... and is arbitrable.

*Prudential Lines,* 704 F.2d at 64 (quotation marks and citation omitted). Dreyfus argues that the letters of indemnity are collateral agreements, while Blystad contends that they are inextricably tied up with issues raised by the Charter.

In *Fairmont Shipping (H.K.), Ltd. v. Primary Industries Corp.,* No. 86 Civ. 3668(SWK), 1988 WL 7805 (S.D.N.Y. Jan.25, 1988), *aff'd,* 940 F.2d 649 (2d Cir. 1991), Judge Kram ruled that a letter of indemnity was a collateral agreement to a charter party, because "[t]he charter party nowhere references the letter of indemnity, nor does it require that a letter of indemnity be issued." *Id.* at *4. The court then explained that "[t]he present dispute [arising under the letter of indemnity] is not a 'sub-issue' of a dispute arising under the charter party, but is instead a separate agreement, merely connected to the charter party by reference." *Id.; see also United Philippine Lines, Inc. v. Metalsrussia Corp.,* No. 96 Civ. 8868(MBM), 1997 WL 214959, at *3 (S.D.N.Y. Apr.24, 1997) (parties conceded that the letter of indemnity was "an agreement separate from the charter party"); *but see Metal Transport Corp. v. Compania National Naviera, S.A.,* 268 F.Supp. 456, 458 (S.D.N.Y.1965) ("While the Charter Party makes no direct reference to the addendum or to the letter of indemnity, they were an integral part of it and were intended to change the printed terms, conditions and exceptions.").

Although *Fairmont Shipping* differs in some respects from this case—most notably because the letter of indemnity and charter at issue there involved different parties—its reasoning nevertheless applies here.[4] The letters of indemnity at issue here did not "explicitly incorporate [the Charter] or any of its terms" and they were written after the Charter "had been negotiated and signed." 1988 WL 7805, at *4. In addition, the Charter does not "reference[ ][a] letter of indemnity, nor does it require that a letter of indemnity be issued." *Id.* Although Blystad argues that the Charter does reference a letter of indemnity, the clause identified by Blystad states that "[a]ny change in loading or discharging ports or berths shall be made only as the result of *special agreement in writing* between Charterer and Owner." Dahl Aff., Ex. B, Cl. 6(c) (emphasis added). Blystad also argues that the letters of indemnity are inextricably interrelated to the Charter, citing two cases in which courts ruled that, because a subsequent agreement merely supplemented an original agreement, the arbitration clause contained in the original agreement applied to the subsequent agreement. *See S.A. Mineracao Da Trindade–Samitri v. Utah International, Inc.,* 745 F.2d 190, 195 (2d Cir.1984); *Vittoria Corp. v. New York Hotel and Motel Trades Council,* 30 F.Supp.2d 431, 436–37 (S.D.N.Y.1998). In this case, however, the letters of indemnity did not supplement or restate the Charter. Consequently, the letters of indemnity are "separate, side agreement[s]," *see Prudential Lines,* 704 F.2d at 64, that are collateral agreements to the Charter.

**2. Do Blystad's claims arise under the Charter or the letters of indemnity?**

Having determined that the letters of indemnity are collateral agreements to the

---

4. Although Blystad argues that *Fairmont Shipping* is inapposite, it cites an earlier opinion in that case. *See* Memorandum of Respondent in Opposition to Motion to Stay Arbitration and Enforce English Forum Selection Clause ("Opp.Mcm.") at 12–13 (citing *Fairmont Shipping (H.K.) Ltd. v. Primary Industries,* No. 86 Civ. 3668(SWK), 1987 WL 9433 (S.D.N.Y. Apr.7, 1987) (ordering evidentiary hearing)).

Charter, the Court now must determine under which document Blystad's claims against Dreyfus arise. This question is complicated by the fact that Blystad has asserted claims under both the Charter and the letters of indemnity. In its demand for arbitration, Blystad stated that its claims were "for breach of charter in connection with a discharge of a cargo of soyabean oil at Qin Huang Dao, China" and that those claims "include, without limitation, compensation for the damages it has suffered directly, and an indemnity for any and all liability it has or may suffer to third parties, as a result of Dreyfus' breach." *See* Nourse Aff., Ex. A. In addition, Blystad's Memorandum of Law identifies a number of Charter provisions under which it could state claims against Dreyfus. *See* Opp. Mem. at 19–20. On the other hand, Blystad's claim in the London proceeding is limited to a claim under the letters of indemnity. *See* Kirkpatrick Decl., Ex. A. (describing claim as "breach of a contract contained in and/or evidenced by" the letters of indemnity).

To determine whether Blystad's claims arise under the Charter—and therefore are arbitrable—the Court must "review[ ] the allegations underlying the dispute and [ask] whether the claim alleged implicates issues of contract construction or the parties' rights and obligations under it." *Collins & Aikman*, 58 F.3d at 23. Put another way:

> In determining whether a particular claim falls within the scope of the parties' arbitration agreement, we focus on the factual allegations in the complaint rather than the legal causes of action asserted. If the allegations underlying the claims 'touch matters' covered by the parties' [agreement containing an arbitration clause], then those claims must be arbitrated, whatever the legal labels attached to them.

*Genesco, Inc. v. T. Kakiuchi & Co.*, 815 F.2d 840, 846 (2d Cir.1987) (quoting *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 624 n. 13, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985)); *see also WorldCrisa Corp.*, 129 F.3d at 74–75

(applying both *Collins & Aikman* and *Genesco* standards to determine whether a particular claim fell within the scope of an arbitration clause). Accordingly, the Court will look beyond the legal labels attached to Blystad's claims in order to determine whether they arise under the Charter.

Blystad has identified a number of Charter provisions under which it alleges that its claims arise. *See* Opp. Mem. at 19–20. Many of these clauses have no counterpart in the letters of indemnity, as illustrated by these three examples:

7. PUMPING IN AND OUT. HOSES. (a) The cargo shall be pumped into the Vessel at the expense, risk and peril of the Charterer, and shall be pumped out of the Vessel at the expense of the Vessel, but at the risk and peril of the Vessel only so far as the Vessel's permanent hose connections, where delivery of the cargo shall be taken by the Charterer or consignee. The Vessel shall furnish her pumps and the necessary steam for discharging in all ports where the regulations permit of fire on board, as well as necessary hands. Should regulations not permit fires on board, the Charterer or consignee shall supply, at its expense, all steam necessary for discharging as well as loading, but the Owner shall pay for steam supplied to the Vessel for all other purposes. If cargo is loaded from lighters, the Vessel, if permitted to have fires on board, shall, if required, furnish steam to lighters at Charterer's expense for pumping cargo into the Vessel.

(h) Unless notation or exception is made in writing on the bill of lading, or other shipping document before departure of the Vessel from the dock or place at which the said cargo is delivered, receipt of the cargo shall be deemed prima facie evidence of right delivery of the entire cargo as described in the bill of lading; further, that upon failure or refusal by the Charterer or its representative to execute or except to the ullage reports

prepared by the Vessel, the figures stated in said ullage reports shall be deemed prima facie correct and binding upon the parties hereto.

12. DUES, WHARFAGE, TAXES. The vessel shall be free of any wharfage, dockage, quay dues or similar charges at all loading and discharging ports. Entrance and clearance fees whether measured by the volume of cargo or not, towing and tag charges, pilotage, dues, and other usual port charges on the Vessel shall be paid by the Owner. All other dues, taxes, assessments, and charges on the cargo shall be paid by the Charterer including but not without limitation any habilitation tax, Customs overtime, taxes on freight at loading or discharging ports as well as any unusual taxes, assessments or governmental charges whether in effect at present or whether imposed on the Vessel or freight in the future and whether or not measured by the volume of the cargo, shall be paid by the Charterer.

24. BILLS OF LADING. Bills of Lading in the form appearing below for cargo shipped shall be signed by the Master or Agent as requested. Any bill of lading signed by the Master or Agent of the Owner shall be without prejudice to the terms, conditions and exceptions of this Charter and shall be subject to all such terms, conditions and exceptions. The Charterer shall indemnify the Owner, the Master, and the Vessel from all consequences or liabilities that may arise from the Charterer or its agents or the Master or Vessel's agents signing bills of lading or other documents inconsistent with this Charter or from any irregularity in papers supplied by the Charterer or its agents, or from

complying with any orders of the Charterer or its agents.

Dahl Aff., Ex. B; *see* Opp. Mem. at 19–20. At this stage in the proceedings, I have no basis to conclude that the claims asserted by Blystad in the arbitration do *not* arise under the Charter provisions. Because these claims arise under the Charter, they are arbitrable. *See* Dahl Aff., Ex. B, Cl. 31 (requiring arbitration of "[a]ny dispute arising from the making, performance or termination of this Charter Party").

Dreyfus does not contest the specific relevance of each of the Charter provisions cited by Blystad. Rather, Dreyfus argues that Blystad's claims cannot arise under the Charter because the bills of lading fixed the place for delivery of the soyabean oil—and therefore for performance of the Charter—as Qingdao. According to Dreyfus, any claims stemming from the delivery of the soyabean oil at Qin Huang Dao, rather than Qingdao, must arise under the letters of indemnity.[5]

Dreyfus' argument fails because the Charter explicitly contemplates a change in the port of delivery, without any mention that such a change will result in the termination of the Charter. *See* Dahl Aff., Ex. B, Cl. 6(c) ("Any change in loading or discharging ports or berths shall be made only as the result of special agreement in writing between Charterer and Owner" and that "Charterer shall assume all cost incident to such change, including the value of the vessel's time if the voyage is prolonged thereby."). The letters of indemnity indemnified Blystad against any claims resulting from the delivery of the goods to Qin Huang Dao; they did not erase Dreyfus' obligation to properly perform its responsibilities under the Charter

---

**5.** According to Blystad, Dreyfus has argued in the London High Court that Blystad's claims do not arise under the letters of indemnity. Blystad contends that, by adopting opposing positions before this Court and the London High Court, Dreyfus hopes to evade liability entirely. Dreyfus denies that it has taken an opposing position in the London High Court and that it seeks to evade liability in that

manner. *See* Transcript of Feb. 24, 2000 Telephone Conference, at 8. Moreover, Blystad itself argued, in an arbitration hearing with Bergesen, the Vessel's owner, that the English jurisdictional clause in the letters of indemnity at issue in this case trumped a New York arbitration clause contained in Blystad's charter with Bergesen. *See* Nourse Aff., Ex. C, at 8–14.

itself, including the responsibilities asserted by Blystad in the arbitration. In addition, Dreyfus admits that the letters of indemnity are not novations that completely replaced the Charter. *See* Reply Memorandum of Petitioner, Louis Dreyfus Negoce S.A. ("Reply Mem."), at 6 ("There is no issue of novation presented because Dreyfus does not argue that the Charter was completely displaced or 'extinguished' by the letters of indemnity.").[6]

Because Blystad has asserted claims under the Charter, Dreyfus' request for a stay of the New York arbitration must be denied. But Blystad also has asserted claims under the letters of indemnity. The next question, then, is whether those claims also are subject to arbitration, even though Blystad has asserted them in the London High Court, because they implicate the parties' rights and obligations under, or touch matters covered by, the Charter. *See Collins & Aikman,* 58 F.3d at 23; *Genesco,* 815 F.2d at 846; *see also Fluor Daniel Intercontinental, Inc. v. General Electric Co.,* No. 98 Civ. 7181(WHP), 1999 WL 637236, at *8 (S.D.N.Y. Aug.20, 1999) ("The phrase 'touch matters' has been interpreted to mean 'arising in connection with.'") (citation omitted).

In the London High Court, Blystad seeks "an indemnity ... in respect of liability, loss and damage" suffered as a result of the arrest of the Vessel and Blystad's compliance with Dreyfus' request that the soyabean oil be delivered at Qin Huang Dao. *See* Kirkpatrick Decl., Ex. A. At a minimum, that claim implicates Clause 6(c) of the Charter, which provides that, in case of any change in discharging port, "Charterer shall assume all cost incident to such change, including the value of the vessel's time if the voyage is prolonged thereby." Dahl Aff., Ex. B, Cl. 6(c). In addition, several of Blystad's claims under the Charter overlap significantly with its claims under the letters of indemnity. *See* pp. 175–76 *supra.* For example, Blystad claims that it will assert, in the arbitration proceeding, "claims for an indemnity arising by operation of law as a result of its following Dreyfus' orders to change the discharge port and to deliver the cargo without presentation of original bills of lading." Opp. Mem. at 20.

Blystad's asserted claims under the letters of indemnity clearly touch matters covered by, and implicate the parties' rights and obligations under, the Charter. *See WorldCrisa Corp.,* 129 F.3d at 75 ("The complaint in the Connecticut Action relies on Armstrong's alleged failure to satisfy his obligations ... under the Agreement. Armstrong has a right to have issues related to that claim decided in the pending arbitration."); *see also Doctor's Associates, Inc. v. Quinn,* 42 F.Supp.2d 184, 187 (D.Conn.1999) ("[I]t is hard to see how a court could ... forego any consideration of defendant's role as development agent and his duties outlined in the DA Agreement [which contained an arbitration clause] in resolving the dispute over the oral agreement [which did not]."), *aff'd,* No. 99–7344, 205 F.3d 1322, 1999 WL 1254513 (2d Cir. Dec.9, 1999). Mindful of the Second Circuit's guidance that a court should "compel arbitration unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute," *Collins & Aikman,* 58 F.3d at 19 (quotation marks and citations omitted), I conclude that all of Blystad's claims against Dreyfus must be heard in the New York arbitration. *See Kerr–McGee Refining Corp. v. M/T Triumph,* 924 F.2d 467, 470 (2d Cir.1991) (RICO claim fell within scope of charter party's arbitration clause because "[o]nce the parties have agreed to arbitrate disputes arising under an agreement—here the Charter—the arbitrators

---

**6.** Indeed, Dreyfus recognizes that Blystad still can bring claims under the Charter, noting in its reply brief that "when Blystad submitted a claim for demurrage following the vessel's departure from China, based upon the time spent discharging the cargo at Qin Huang Dao and Shantou, that claim was based upon the Charter's provisions for calculation of laytime and demurrage and was settled and paid by Dreyfus." Reply Mem. at 6.

should be able to consider any conduct of the parties that bears on the damages appropriate for a covered dispute.").[7]

### C. Has Blystad waived the right to demand arbitration?

Finally, although Dreyfus does not argue explicitly that Blystad has waived its right to demand arbitration by filing a claim in London, Dreyfus does refer repeatedly to the London proceeding. Accordingly, I will briefly address the question of waiver. "Federal policy strongly favors arbitration as an alternative means of dispute resolution.... This preference for arbitration has led to its corollary that any doubts concerning whether there has been a waiver are resolved in favor of arbitration." *PPG Industries, Inc. v. Webster Auto Parts Inc.*, 128 F.3d 103, 107 (2d Cir.1997) (quotation marks and citations omitted).

■ The Second Circuit has developed a clear standard for determining when a party has waived its right to arbitration. "[A] party waives its right to arbitration when it engages in protracted litigation that prejudices the opposing party." *Id.* at 107. A court should consider three factors in determining whether a party has waived its right to demand arbitration: "(1) the time elapsed from the commencement of litigation to the request for arbitration, (2) the amount of litigation (including any substantive motions and discovery), and (3) proof of prejudice." *Id.*

■ Blystad has not waived its right to demand arbitration. First, Blystad made its first demand for arbitration one week after filing its London claim. Second, there has not been extensive discovery or motion practice in the London proceeding, although Dreyfus notes that all relevant parties have appeared in the London action. Third, Blystad has not demonstrated any prejudice as a result of the London proceeding. *See id.* at 109 ("We have held that sufficient prejudice to sus-

tain a finding of waiver exists when a party takes advantage of pre-trial discovery not available in arbitration."); *Cotton v. Slone*, 4 F.3d 176, 179 (2d Cir.1993) ("Sufficient prejudice to infer waiver has been found when a party seeking to compel arbitration engages in discovery procedures not available in arbitration, makes motions going to the merits of an adversary's claims, or delays invoking arbitration rights while the adversary incurs unnecessary delay or expense.") (citations omitted). Although Dreyfus makes much of the fact that Blystad initiated the London proceeding, even a party that initiates litigation does not waive its right to demand arbitration, absent a finding of prejudice. *See Zwitserse Maatschappij Van Levensverzekering En Lijfrente v. ABN International Capital Markets Corp.*, 996 F.2d 1478, 1479 (2d Cir.1993) ("[A] party initiating judicial proceedings may waive its right to arbitration ... when [that] party has unfairly used litigation prior to commencing arbitration in a way that might prejudice the opposing party.") (citations omitted).

## III. CONCLUSION

For the foregoing reasons, Dreyfus' motion for an order: (1) declaring that the claim brought by Blystad against Dreyfus is not subject to arbitration in New York; (2) staying any further proceedings in the pending New York arbitration; and (3) enforcing a choice of law/choice of forum provision stipulating that Blystad's claim must be brought in London is DENIED. The Clerk is directed to close this case.

SO ORDERED:

---

**7.** I express no opinion as to whether Blystad could assert any claims under the letters of indemnity that do not touch matters covered

by the Charter. In this case, however, all of the claims asserted by Blystad in the London High Court meet that standard.