**LOUIS DREYFUS NEGOCE S.A.,
Petitioner–Appellant,**

**v.**

**BLYSTAD SHIPPING & TRADING
INC., Respondent–Appellee.**

**Docket No. 00–7382.**

United States Court of Appeals,
Second Circuit.

Argued Oct. 24, 2000.

Decided June 7, 2001.

Shaun F. Carroll, New York, N.Y. (David A. Nourse, Katharine F. Newman, Nourse & Bowles, LLP, New York, NY, of counsel), for Petitioner–Appellant.

Simon Harter, New York, N.Y. (Elizabeth McKenna, Healy & Baillie, LLP, New York, NY, of counsel), for Respondent–Appellee.

Before: CARDAMONE, WINTER, and POOLER, Circuit Judges.

CARDAMONE, Circuit Judge:

When changing horses in midstream much mischief may occur, outweighing the supposed advantages. In this appeal, the port of destination for an international shipment of cargo was changed in mid-ocean, so to speak. But the result—as the facts here attest—was the same as when changing horses in midstream.

Louis Dreyfus Negoce S.A. (Dreyfus or appellant) appeals the February 29, 2000 order of the United States District Court for the Southern District of New York (Scheindlin, J.), which denied its motion to stay a New York arbitration in favor of proceedings in London before the High Court of Justice, Queens Bench Division. Dreyfus had a contract to deliver soyabean oil to China and needed a ship to transport the cargo. It therefore entered into a tanker voyage charter party with Blystad Shipping & Trading, Inc. (Blystad or charterer), a vessel charterer. During the voyage, Dreyfus requested that Blystad change the cargo discharge port, and issued letters of indemnity to the charterer for any liability that acquiescence to this request might engender.

When the chartered vessel was detained at the new discharge port for three months, Blystad sued Dreyfus in London on the letters of indemnity. A week after the charterer commenced the London lawsuit, it sought to enforce a provision of the charter party calling for arbitration of disputes between the signatories in New York. Dreyfus resisted arbitration in New York, contending that Blystad's claim must be brought under the letters of indemnity, rather than the charter party. Accordingly, Dreyfus asked the district court to stay the New York arbitration. When that request was denied, this appeal ensued.

BACKGROUND

*Genesis of the Dispute*

The facts of the instant litigation, arising from the transport of crude degummed soyabean oil from the United States to China, are largely undisputed. In 1993 Blystad, a Liberian corporation, entered into a time charter party with Thorsfreddy K/S (Thorsfreddy), owners of the M.T. THORSFREDDY (vessel). Under the charter, Blystad was allowed to direct the destination ports for the vessel and the cargo being transported, but Thorsfreddy as owner remained in charge of the operation of the vessel. The time charter provided that any dispute between Blystad and Thorsfreddy, brought pursuant to the

agreement, would be arbitrated in New York.

Three years later, on November 27, 1996, Blystad entered into a tanker voyage charter party (charter party or charter) with appellant Louis Dreyfus Negoce S.A., a French corporation. Under the charter party Blystad leased the vessel to Dreyfus for a single voyage. Dreyfus entered into this maritime agreement to carry out its obligations as seller under a sales contract, pursuant to which it had promised to deliver 25,000 metric tons of soyabean oil in China to the buyer, Lief Enterprises (Lief). Lief intended to sell the soyabean oil to Kaland Limited (Kaland), the ultimate purchaser.

The charter party provided for the transport of the soyabean oil from Brownsville, Texas and New Orleans, Louisiana, to one, or two, unspecified discharge ports in China. The preamble of the charter party stated that delivery was to be "as ordered on signing bills of lading to the port or ports of discharge," indicating that the tanker bills of lading would designate the discharge ports. The vessel was loaded in December 1996 and, following instructions from Lief, Dreyfus issued bills of lading on behalf of the vessel providing for discharge at Qingdao, China.

On January 13, 1997, in the midst of the voyage, Blystad advised Dreyfus that the vessel was scheduled to arrive in China in five days and that the original bills of lading had not arrived in Qingdao. Blystad therefore asked Dreyfus to arrange for a letter of indemnity from Lief and forwarded a draft form for such letter, so that the vessel could discharge its cargo upon arrival. Blystad declares that since a carrier is obligated to deliver its cargo only upon presentation of the original bill of lading, it has become common practice in the shipping industry for the receiver to issue a letter of indemnity promising to indemnify the carrier for any liability for delivery without the original bill. This practice reflects the fact that a vessel owner's protection and indemnity insurance typically does not cover the delivery of cargo without the original bill of lading.

Lief, following the orders of Kaland, the ultimate purchaser, on January 15, 1997 requested that Dreyfus change the discharge port to Qin Huang Dao, China. Appellant informed Blystad that it, as the seller, and Lief, as the receiver, would issue letters of indemnity covering both the change of discharge ports and the discharge of cargo without presentation of the original bills of lading. Clause 6(c) of the charter party specifically covered appellant Dreyfus' obligations when requesting a change in destination

> [Dreyfus] warrants that the cargo shall be discharged at the ports and berths specified [by the original bills of lading]. Any change in loading or discharging ports or berths shall be made only as the result of special agreement in writing between [Dreyfus] and [Blystad], and in such case, [Dreyfus] shall assume all cost incident to such change, including the value of the vessel's time if the voyage is prolonged thereby.

On January 20 Lief provided two letters of indemnity to Dreyfus, in the form requested by Blystad, and addressed them to Blystad as "owners" and Dreyfus as "charterers." Dreyfus endorsed these letters, superimposed them on its own letterhead and forwarded them to Blystad, which then forwarded them to Thorsfreddy. After Thorsfreddy said the letters were satisfactory, Blystad instructed the vessel to discharge the soyabean cargo at the newly designated port of Qin Huang Dao.

The letters guaranteed that Dreyfus, and in turn Lief, would indemnify Blystad "in respect of any liability, loss or damage

of whatsoever nature which you may sustain by reason of delivering the goods to China Ocean Shipping Agency, Qin Huang Dao," and requested delivery to that city without presentation of the original bills of lading. The letters also contained a choice of law and choice of forum clause, providing that "[t]his indemnity shall be construed in accordance with English Law and each and every person liable under this indemnity shall, at your request, submit to the jurisdiction of the High Court of Justice of England."

After the issuance of the letters of indemnity the vessel sailed on to Qin Huang Dao. Upon arrival, the soyabean oil was discharged and promptly seized by the Chinese Customs Bureau. The vessel was arrested by order of the Tianjin Maritime Court. The proffered reasons for the arrest were the delivery of cargo without production of the original bills of lading and the change in discharge ports from Qingdao to Qin Huang Dao. The vessel was detained at Qin Huang Dao until Thorsfreddy and Blystad paid security for its release three months later.

### Prior Legal Proceedings

After the detention of its vessel, Thorsfreddy commenced arbitration in New York against Blystad, pursuant to the arbitration clause of the time charter between the parties. In an April 27, 1999 decision, the arbitration panel held that Blystad must indemnify Thorsfreddy under the time charter for the expenses incurred due to the detention of the vessel at Qin Huang Dao. On July 20, 2000 a final award was rendered in Thorsfreddy's favor in the sum of $659,268.67.

On March 5, 1997 Blystad brought suit against Dreyfus and Lief in London before the High Court of Justice, Queens Bench Division, Commercial Court (London action), under the letters of indemnity. Blystad sought damages for breach of the January 20 letter-contracts, and indemnification pursuant to the letters for any losses due to the detention of the vessel and the discharge of its cargo at Qin Huang Dao. Dreyfus and Lief have since appeared in the London action, although Dreyfus has apparently urged that the letters of indemnity are inapplicable in that action and that the Queens Bench thus has no jurisdiction. Its basis for this argument is that the soyabean oil was not delivered to the China Ocean Shipping Agency as provided for in the letters of indemnity, but instead was seized by the Chinese Customs authority. Notwithstanding these objections, Dreyfus and Lief have both since responded to Blystad's claim in the London action, Dreyfus has interposed an indemnity claim against Lief, and Lief has impleaded Kaland and asserted its own third-party claim for indemnity. The London action is still pending.

A week after initiating the London action, Blystad—allegedly because of Dreyfus' objections to jurisdiction in London—demanded that Dreyfus participate in arbitration in New York. By letter of March 13, 1997 Blystad requested arbitration for "breach of charter" and sought "compensation for the damages it has suffered directly, and an indemnity for any and all liability it has or may suffer to third parties, as a result of Dreyfus' breach." This demand for arbitration was brought pursuant to clause 31 of the charter, entitled "Arbitration," which states "[a]ny dispute arising from the making, performance or termination of this Charter Party shall be settled in New York." Dreyfus responded to the request and, as provided for by the charter, appointed an arbitrator, but conditioned its response on its objection that Blystad's claim is subject to resolution in London, not New York.

On November 5, 1999 appellant petitioned the district court for an order: (1) declaring that Blystad's indemnity claim against Dreyfus is not subject to the New York arbitration; (2) staying further proceedings in the arbitration upon that claim; and (3) enforcing the choice of forum clause of the letters of indemnity. In a February 29, 2000 order, the district court denied Dreyfus' motion, holding that Blystad's claim was within the scope of the charter's arbitration clause, and that Blystad had not waived its right to New York arbitration by bringing suit in London first. *Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading, Inc.*, 88 F.Supp.2d 168, 177–78 (S.D.N.Y.2000). A subsequent motion for reconsideration was denied. *Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading, Inc.*, 94 F.Supp.2d 474, 476–77 (S.D.N.Y.2000). Dreyfus appeals from the denial of its petition. We affirm.

## DISCUSSION

Dreyfus contends on appeal that the claim asserted by Blystad in the New York arbitration is outside the scope of the charter's arbitration provision, and that any potential claim by Blystad must be asserted in London under the letters of indemnity. In support of this proposition Dreyfus argues that clause 31 of the charter is a narrow arbitration clause, by which disputes that are collateral to the agreement's explicit provisions are excluded from arbitration. Dreyfus continues, saying that Blystad's claim is not directly under the charter because performance under that maritime agreement was allegedly concluded upon the fixing of the bills of lading, providing for transport of the cargo to Qingdao. Since clause 31 limits coverage to disputes "arising from the making, performance or termination" of the charter, and performance was allegedly completed upon the issuance of the bill of lading, any

claim by Blystad concerning the voyage to Qin Huang Dao would have to be made under the letters of indemnity. Appellant concludes the letters of indemnity are collateral agreements, so that a suit under them is thereby outside the scope of the narrow arbitration clause.

The district court ruled that although the letters of indemnity were collateral to the charter, the claims asserted thereunder touched upon matters covered by and implicated rights set out in the charter. *Louis Dreyfus Negoce*, 88 F.Supp.2d at 174, 177. It did not believe it necessary to determine whether clause 31 was a broad or a narrow clause, *id.* at 173, and further rejected appellant's unvoiced but implicit claim that Blystad had waived its right to arbitration by first bringing suit in London, *id.* at 178.

### I Blystad's Claim Is Within the Scope of Clause 31

■ We review *de novo* a district court's ruling regarding the scope of an arbitration clause. *CPR (USA) Inc. v. Spray*, 187 F.3d 245, 254 (2d Cir.1999). It is familiar law that the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.* (1994) (Arbitration Act), expresses "a liberal federal policy favoring arbitration agreements" and that "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983). Arbitration is especially favored in resolving disputes involving international commerce, *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 631, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985), although the rationale of comity with foreign arbitral fora that undergirds this preference is not presently implicated, as the arbitration is set in New York. *Cf.*

*Genesco, Inc. v. T. Kakiuchi & Co.*, 815 F.2d 840, 853 (2d Cir.1987).

While federal policy generally favors arbitration, the obligation to arbitrate nevertheless remains a creature of contract. Because arbitrators' authority arises only when the parties agree in advance to that forum, "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *AT & T Techs., Inc. v. Communications Workers of Am.*, 475 U.S. 643, 648, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986) (quoting *Steelworkers v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960)).

### A. *Analysis of Arbitration Clause*

■ To determine whether a particular dispute falls within the scope of an agreement's arbitration clause, a court should undertake a three-part inquiry. First, recognizing there is some range in the breadth of arbitration clauses, a court should classify the particular clause as either broad or narrow. *See Mehler v. Terminix Int'l Co.*, 205 F.3d 44, 49 (2d Cir. 2000); *Peerless Imps., Inc. v. Wine, Liquor & Distillery Workers Union Local One*, 903 F.2d 924, 927 (2d Cir.1990); *McDonnell Douglas Fin. Corp. v. Pa. Power & Light Co.*, 858 F.2d 825, 832 (2d Cir.1988). Next, if reviewing a narrow clause, the court must determine whether the dispute is over an issue that "is on its face within the purview of the clause," or over a collateral issue that is somehow connected to the main agreement that contains the arbitration clause. *Rochdale Vill., Inc. v. Pub. Serv. Employees Union*, 605 F.2d 1290, 1295 (2d Cir.1979); *see also Prudential Lines, Inc. v. Exxon Corp.*, 704 F.2d 59, 64 (2d Cir.1983). Where the arbitration clause is narrow, a collateral matter will generally be ruled beyond its purview. *See Cornell Univ. v. UAW Local 2300*, 942 F.2d 138, 140 (2d Cir.1991).

Where the arbitration clause is broad, "there arises a presumption of arbitrability" and arbitration of even a collateral matter will be ordered if the claim alleged "implicates issues of contract construction or the parties' rights and obligations under it." *Collins & Aikman Prods. Co. v. Bldg. Sys., Inc.*, 58 F.3d 16, 23 (2d Cir.1995).

The district court failed to classify the charter's arbitration clause before holding that the letters of indemnity, as collateral agreements, were still within the scope of the arbitration clause. In doing so, it relied upon our decision in *WorldCrisa Corp. v. Armstrong*, 129 F.3d 71, 75 (2d Cir. 1997), which, in turn, purportedly relied upon our holding in *Collins*. *WorldCrisa*, while distinguishing broad arbitration clauses from narrow ones, extended the language of *Collins* beyond the meaning originally intended. We held in *Collins*:

> [I]f the arbitration clause is *broad*, there arises a presumption of arbitrability; if, however, the dispute is in respect of a matter that, on its face, is clearly collateral to the contract, then a court should test the presumption by reviewing the allegations underlying the dispute and by asking whether the claim alleged implicates issues of contract construction or the parties' rights and obligations under it.

*Collins*, 58 F.3d at 23 (emphasis added).

But in *WorldCrisa* we implied that this same test should apply to a *narrowly* worded arbitration clause, 129 F.3d at 74–75, despite precedent in which we consistently held that matters collateral to an agreement fall outside the scope of a narrow arbitration clause. *See, e.g., Peerless Imps.*, 903 F.2d at 927; *McDonnell Douglas Fin. Corp.*, 858 F.2d at 832; *Prudential Lines*, 704 F.2d at 63–64; *McAllister Bros., Inc. v. A & S Transp. Co.*, 621 F.2d 519, 522 (2d Cir.1980); *Rochdale Vill.*, 605 F.2d at 1295. Yet, because we explicitly

held in *WorldCrisa* that the arbitration clause at issue was broad enough to justify a presumption of arbitrability, 129 F.3d at 75, its language regarding narrow arbitration clauses is *dicta*, which we are not obliged to extend to the case at hand. *See CFTC v. Dunn*, 58 F.3d 50, 53–54 (2d Cir.1995) ("When a prior decision makes statements in a line of reasoning that are broader than necessary to the affirmance or reversal of a judgment, a later panel may confine the precedential effect to a narrower ground within the line of reasoning."), *rev'd on other grounds*, 519 U.S. 465, 117 S.Ct. 913, 137 L.Ed.2d 93 (1997).

We think making a distinction between broad and narrow arbitration clauses is necessary and sound, as the "scope of an arbitration clause, like any contract provision, is a question of the intent of the parties." *S.A. Mineracao da Trindade-Samitri v. Utah Int'l, Inc.*, 745 F.2d 190, 193 (2d Cir.1984). When parties use expansive language in drafting an arbitration clause, presumably they intend all issues that "touch matters" within the main agreement to be arbitrated, *Genesco*, 815 F.2d at 846, while the intended scope of a narrow arbitration clause is obviously more limited.

### B. *Clause 31 Is a Broad Arbitration Clause*

■ Appellant maintains that clause 31 is a narrow arbitration clause, but provides scant support for this contention. No fixed rules govern the determination of an arbitration clause's scope; while very expansive language will generally suggest a broad arbitration clause, *see, e.g., Collins*, 58 F.3d at 18 ("Any claim or controversy arising out of or relating to this agreement shall be settled by arbitration."), we have also found broad clauses when examining phrasing slightly more limited, *see, e.g., Abram Landau Real Estate v. Bevona*, 123

F.3d 69, 71 (2d Cir.1997) ("Contract Arbitrator shall have the power to decide all differences arising between the parties to this agreement as to interpretation, application or performance of any part of this agreement."). In the end, a court must determine whether, on the one hand, the language of the clause, taken as a whole, evidences the parties' intent to have arbitration serve as the primary recourse for disputes connected to the agreement containing the clause, or if, on the other hand, arbitration was designed to play a more limited role in any future dispute. *See Mitsubishi Motors Corp.*, 473 U.S. at 626, 105 S.Ct. 3346 ("[T]he first task of a court asked to compel arbitration of a dispute is to determine whether the parties agreed to arbitrate that dispute. . . . [A]s with any other contract, the parties' intentions control, but those intentions are generously construed as to issues of arbitrability.").

■ Clause 31 of the charter, although "not unlimited," *Rochdale Vill.*, 605 F.2d at 1296, is a broad clause. It mandates that "[a]ny dispute arising from the making, performance or termination of this Charter Party" be arbitrated. The clause contains two parts that bear upon the determination of its breadth, neither of which indicates that the parties intended to limit the scope of arbitration narrowly. The first part of the clause provides that it covers all disputes "arising from" the charter. In *In re Kinoshita & Co.*, 287 F.2d 951, 953 (2d Cir.1961), an early decision dealing with the scope of arbitration clauses under the Arbitration Act, we intimated that the use of the phrase "arising under" an agreement, in an arbitration clause, indicated that the parties intended the clause be narrowly applied. We have, however, since limited this holding to its facts, declaring that absent further limitation, only the precise language in *Kinoshita* would evince a narrow clause. *S.A. Mineracao*,

745 F.2d at 194 (holding that language of "aris[ing] or occur[ring] under" the agreement did not indicate a narrow arbitration clause) (alterations in original). The parties in this case did not utilize such precise language. To the extent a distinction exists between the present language of "arising from" and *Kinoshita's* language of "arising under," we believe the distinction is more than just a semantic one, and only the latter phrase limits arbitration to a literal interpretation or performance of the contract. *See Roby v. Corp. of Lloyd's,* 996 F.2d 1353, 1361 (2d Cir.1993) (holding relevant language indicated a broader forum selection clause, and stating that "[w]e find no substantive difference in the present context between the phrases 'relating to,' 'in connection with' or *'arising from'* ") (emphasis added); *see also J.J. Ryan & Sons, Inc. v. Rhone Poulenc Textile, S.A.,* 863 F.2d 315, 321 (4th Cir.1988) (holding that language of "arising in connection with" indicated a more expansive arbitration clause).

Neither does the language of the second part of clause 31, "the making, performance or termination of this Charter Party," suggest an intention by the parties to limit the scope of the clause. While declaring that the overall tone of the arbitration clause controlled its scope, we held in *Prudential Lines* that "[s]pecific words or phrases alone may not be determinative although words of limitation would indicate a narrower clause." 704 F.2d at 64; *see also Cornell Univ.,* 942 F.2d at 140 (considering narrow arbitration clause that provided for arbitration of "any matter involving the interpretation or application of this Agreement which alleges a violation of the rights of an employee or the Union under the terms of this Agreement"); *McDonnell Douglas Fin. Corp.,* 858 F.2d at 832 (holding that clause providing for arbitration in the case of disagreement over "computation of the amount of the

required indemnity payment or refund thereof" is narrow). Dreyfus believes that because clause 31 contains what is alleged to be language of limitation, arbitration is limited to disputes directly under the charter. We do not adopt that view.

The charter governed a single shipment of soyabean oil aboard the vessel M.T. THORSFREDDY. It is difficult to perceive how the language used, *i.e.,* "the making, performance or termination" of the charter could be construed as other than intending to cover all disputes connected to this lone voyage. *See Coors Brewing Co. v. Molson Breweries,* 51 F.3d 1511, 1515 (10th Cir.1995) (holding that language of "arising in connection with the implementation, interpretation or enforcement" of agreement was broad); *Nat'l R.R. Passenger Corp. v. Boston & Me. Corp.,* 850 F.2d 756, 760 (D.C.Cir.1988) (holding that language of "[a]ny claim or controversy between [parties] concerning the interpretation, application or implementation" of agreement was broad) (first alteration in original); *Armada Coal Exp., Inc. v. Interbulk, Ltd.,* 726 F.2d 1566, 1568 (11th Cir.1984) (parties admit that clause providing "[a]ny dispute arising during the execution of the Charter Party" is broad) (alteration in original).

The present language is sweeping, covering the full panoply of events, from the time of contracting ("making"), through execution under the terms of the charter ("performance"), until the eventual expiration of the agreement ("termination"). Contrary to appellant's argument, it is more likely these words were included to reflect the desire by the parties to ensure that the entire duration of the agreement be covered, especially since the issue of whether a clause covers an agreement's termination is a common source of litigation. *See, e.g., Abram Landau Real Estate,* 123 F.3d at 73; *Rochdale Vill.,* 605

F.2d at 1296–97. We hold, accordingly, that clause 31 is a broad arbitration clause.

### C. Part of Blystad's Claim Is Directly Under the Charter

The next step in deciding whether Blystad's claim is arbitrable is to determine whether the claim arises directly under the charter party or is collateral to it. In its March 13, 1997 letter demanding arbitration, Blystad sought "compensation for the damages it has suffered directly, and an indemnity for any and all liability it has or may suffer to third parties, as a result of Dreyfus' breach." The claim for direct damages is brought under the agreement, but the claim for indemnification under the letters of indemnity is collateral to the arbitration agreement.

In Blystad's submissions to the district court, it pointed to a number of provisions of the charter—separate from the letters of indemnity—under which it will seek relief before the arbitration panel. These include, inter alia: (1) Part I, clause D, governing discharge ports; (2) Part II, clauses 6(a)-(c), governing safe berths, shifting to other berths, liability for customs overtime and fees for shifting berths, and liability for costs upon a change of discharge ports; (3) Part II, clause 7, governing the pumping of cargo in and out of the vessel; (4) Part II, clause 12, governing expenses at loading and discharge ports; and (5) Part II, clause 24, providing for the charterer's obligation to indemnify the vessel owner for any liabilities resulting from "signing bills of lading or other documents inconsistent with this Charter or from any irregularity in papers supplied by the Charterer or its agents, or from complying with any orders of the Charterer or its agents." Blystad has also asserted that it may make a claim before the arbitrators for an indemnity by operation of law, see, e.g., Nissho–Iwai Co. v. M/T

Stolt Lion, 617 F.2d 907, 913–14 (2d Cir. 1980), based on the order to change discharge ports and to deliver the cargo without the original bills of lading.

■ Appellant raises two principal objections to these parts of Blystad's claim that are purportedly brought directly under the charter party. The first is the assertion that Dreyfus' alleged breach does not implicate the particular provisions of the agreement referenced by Blystad. This objection conflates the question of whether the dispute is within the scope of the arbitration clause with the potential merits of the claim. It is established that under a broad arbitration clause, a dispute under the contract must be arbitrated "[w]hether 'arguable' or not, indeed even if it appears to the court to be frivolous." AT & T Techs., 475 U.S. at 649–50, 106 S.Ct. 1415; accord Coca–Cola Bottling Co. v. Soft Drink & Brewery Workers Union, Local 812, 39 F.3d 408, 410 (2d Cir.1994). As the parties have contractually agreed that disputes brought directly under the charter should be arbitrated, it is not the task of a court to explore their merits.

The second objection to Blystad's claim under the charter provisions is Dreyfus' assertion that "performance" under the charter, as provided by the arbitration clause, was completed upon the original issuance of the bills of lading. Dreyfus insists that once the original bills of lading specified that delivery was to be to Qingdao, neither Blystad nor Dreyfus could unilaterally change the discharge port. Since the vessel could not be compelled to change discharge ports, any change in destination would have to be under a separate agreement—here, the letters of indemnity—and only this separate agreement would govern delivery to Qin Huang Dao, the newly designated port.

Dreyfus' argument does not follow logically. We see no reason to view "perfor-

mance," as provided in clause 31, so narrowly as to encompass only the agreement to proceed to Qingdao, when the obvious purpose of the agreement was to transport soyabean oil from a port in the United States to a port in China. The fact that neither party could unilaterally change the discharge port after the issuance of the bills of lading does not suggest that performance was completed at the point of issuance. Rather, performance under the charter continued until the eventual discharge of the cargo at Qin Huang Dao, notwithstanding the letters of indemnity.

Absent evidence that the parties *intended* the letters should supersede the charter party, both agreements were in effect at the conclusion of the voyage, with the former merely supplementing the latter. As Professor Corbin explained:

> It happens very frequently that a party to a valid contract attempts, either as plaintiff or as defendant, to show that a new contract has been substituted, either as a total discharge or as a partial modification and discharge. The existence of such a new contract of substitution or modification must be established in the same way as is any other contract. *No one will be held to have surrendered or modified any of his contract rights unless he is shown to have assented thereto* in a manner that satisfies the requirements of a valid contract.

6 Arthur Linton Corbin, *Corbin on Contracts* § 1293 (1962) (emphasis added).

■ While the letters of indemnity may constitute a fully executed contract, there is no indication that they were intended to supplant the charter party, rather than simply provide added protection for Blystad in return for agreeing to the change in discharge ports. In fact, clause 6(c) of the charter specifically envisioned such a change, directing that any change be in writing, and mandating that the "Charter-

er shall assume all cost incident to such change, including the value of the vessel's time if the voyage is prolonged thereby." Accordingly, since the charter remained in effect through the voyage to Qin Huang Dao, any claim under that agreement is subject to arbitration.

### D. *The Claim Under the Letters of Indemnity Is Within the Scope of the Arbitration Clause*

Blystad's claim for indemnification under the letters of indemnity is not brought directly under the charter agreement, but is made under a collateral agreement. We have explained that for purposes of arbitration, a collateral agreement is "a separate, side agreement, connected with the principal contract which contains the arbitration clause." *Prudential Lines*, 704 F.2d at 64. The letters were issued subsequent to the charter party and are not specifically incorporated or even referenced by that agreement. While clause 6(c) mandates that all changes in discharge ports be in writing, and provides for compensation for costs incident to this change, it does not explicitly provide for indemnification. Absent any reference by the charter party to the letters, or language indicating that the letters themselves incorporated the charter, these claims must be deemed collateral to the main agreement. *See Fairmont Shipping (H.K.), Ltd. v. Primary Indus. Corp.*, No. 86 Civ. 3668, 1988 WL 7805, at *4 (S.D.N.Y. Jan.25, 1988) (finding letters of indemnity collateral to charter party), *aff'd*, 940 F.2d 649 (2d Cir.1991) (table).

Accordingly, under *Collins*, we test the "presumption of arbitrability" associated with a broad arbitration clause by asking whether claims under letters of indemnity—as claims under a collateral agreement—"implicate[ ] issues of contract construction or the parties' rights and ob-

ligations under it." *Collins,* 58 F.3d at 23. This test is more expansive than the one we apply for a narrow arbitration clause, in which the claim must "on its face" be brought under the terms of the agreement. *Rochdale Vill.,* 605 F.2d at 1295. The letters of indemnity clearly implicate at least two clauses of the charter: clause 6(c), providing for a writing and payment of costs upon a change in discharge ports; and clause 24, providing for indemnification for compliance with the orders of the charterer. By implicating the rights of Blystad and the duties of Dreyfus under the charter party, the letters of indemnity are within the scope of the broad arbitration clause.

## II    Blystad Did Not Waive Its Right to Arbitration

Dreyfus declares that even if Blystad's claim is within the scope of the charter's arbitration clause, Blystad waived its right to arbitrate by first bringing suit in London. We review *de novo* the issue of whether a party has waived its right to arbitration, but "[t]he rule preferring arbitration, when agreed upon, ha[s] led to its corollary that any doubts concerning whether there has been a waiver are resolved in favor of arbitration." *Leadertex, Inc. v. Morganton Dyeing & Finishing Corp.,* 67 F.3d 20, 25 (2d Cir.1995).

We consider three factors in determining whether a party has waived its right to arbitration: (1) the time elapsed from when litigation was commenced until the request for arbitration; (2) the amount of litigation to date, including motion practice and discovery; and (3) proof of prejudice. *Id.* None of these factors supports a finding that Blystad waived its right to arbitrate.

Blystad requested arbitration on March 13, 1997, just eight days after it commenced the London proceedings. This short period of delay, standing alone, certainly does not support a finding of waiver. *PPG Indus., Inc. v. Webster Auto Parts Inc.,* 128 F.3d 103, 108 (2d Cir.1997) (five-month delay does not by itself infer waiver of arbitration). Nor has there been extensive litigation to date; so far the parties have simply appeared before the London High Court, submitted their "Points of Defence" to Blystad's claims, and interposed claims against each other. *Cf. Leadertex,* 67 F.3d at 26 (seven-month delay, during which defendant vigorously pursued discovery, "strongly implies [the party] forfeited its contractual right to compel arbitration").

Of most relevance, Dreyfus has failed to establish that it suffered prejudice as a result of Blystad first initiating proceedings in London. Dreyfus complains that it is exposed to the possibility of inconsistent verdicts by having to litigate in New York. Blystad was found liable to Thorsfreddy in a New York arbitration, and seeks indemnification from Dreyfus. Appellant in turn seeks indemnification from Lief, and Lief seeks indemnification from Kaland. Since Lief and Kaland were not parties to the charter party, they are not subject to the New York arbitration, but have appeared in the London proceeding under the letters of indemnity. Dreyfus' concern, should it be pulled out of the London litigation and forced to arbitrate in New York, is that it might not be able to pass on its liability to those parties ultimately responsible for the detention of the vessel.

This concern, however, is not the type of prejudice that supports a finding of waiver. As we held in *Doctor's Associates, Inc. v. Distajo,* 107 F.3d 126, 134 (2d Cir. 1997), "prejudice as defined by our cases refers to the inherent unfairness—in terms of delay, expense, or damage to a party's legal position—that occurs when the party's opponent forces it to litigate an issue

and later seeks to arbitrate that same issue." Prejudice does not refer to enforcing a bargained-for agreement, even where such enforcement will obligate a party to litigate in more than one forum. *See Moses H. Cone Mem'l Hosp.*, 460 U.S. at 20, 103 S.Ct. 927 ("Under the Arbitration Act, an arbitration agreement must be enforced notwithstanding the presence of other persons who are parties to the underlying dispute but not to the arbitration agreement."). As a consequence, we conclude that Blystad has not waived its right to arbitrate its claim.

In sum, Dreyfus agreed to both the charter party and the letters of indemnity, and absent proof of some form of recognized prejudice, such as undue delay or expense, it may not now seek to avoid the requirements of the arbitration agreement simply because what it bargained for has come to pass.

### CONCLUSION

For the foregoing reasons, we affirm the order of the district court denying appellant's motion to: (1) declare that Blystad's claim is not subject to litigation; (2) stay further proceedings in the New York arbitration; and (3) enforce the London choice of forum provision of the letters of indemnity.

Affirmed.