[752 NYS2d 611]

GERLING GLOBAL REINSURANCE CORPORATION, Appellant, v
HOME INSURANCE COMPANY, Respondent.

First Department, December 17, 2002

## APPEARANCES OF COUNSEL

*Sylvia Semerdjian* of counsel (*David L. Pitchford,* attorney), for appellant.

*Daniel A. Hargraves* of counsel (*Andrew J. Costigan* on the brief; *Hargraves, McConnell & Costigan, P.C.* and *Jonathan Rosen,* attorneys), for respondent.

## OPINION OF THE COURT

SULLIVAN, J.

This appeal—from the grant of defendant's motion to compel arbitration and stay this action seeking the recovery of approximately $3.1 million—presents the issue of whether a reinsurer's claim in equity for restitution of monies had and received, mistakenly paid by the reinsurer, comes within the scope of an arbitration clause limited to disputes involving the interpretation of the reinsurance contracts.

Defendant, The Home Insurance Company, issued three successive excess insurance policies (first policy: $5 million, 1962-1965; second policy: $5 million, 1965-1968; third policy: $10 million, 1968-1971), providing liability coverage for environmental pollution claims against its insured, Federal Pacific Electric Company (FedPac). Home partially reinsured its liability under these policies pursuant to facultative certificates, including two certificates issued by plaintiff, Gerling Global Reinsurance Corporation, which reinsured Home's second and third policies.

Each certificate issued by Gerling contained the following provision, section 9: "[T]he liability of [Gerling] * * * shall follow that of [Home] and except as otherwise specifically provided herein, shall be subject in all respects to all the terms and conditions of [Home's] policy." Section 11 of these certificates provided, "All claims involving this reinsurance, when settled by [Home], shall be binding on [Gerling], who shall be bound to pay its proportion of such settlements." Each of the certificates also contained an arbitration clause stating, "Should an irreconcilable difference of opinion arise as to the interpretation of this [c]ontract, it is hereby mutually agreed that, as a condition precedent to any right of action hereunder, such difference shall be submitted to arbitration."

FedPac sought indemnification from Home for claims arising at a number of pollution sites around the country. Since, under Home's policies, environmental pollution claims arising from losses incurred at each separate site are typically deemed to

constitute a separate occurrence, the claim as to each qualifies as a separate claim against the policy limits. In FedPac's case, Home, in terms of the decision whether to pay the claim and as to the amount to be paid in settlement, handled the various site claims seriatim. FedPac's pollution claims all involved continuing damage/injury that occurred during the policy periods of each of the three policies, causing each of the policies' coverage to be triggered. Each of Home's settlement agreements with FedPac released all three of the Home policies in exchange for a single lump sum payment. None of the settlements allocated the loss among the various policies.

For purposes of billing its reinsurers, however, Home decided upon a methodology for allocating its settlement payment among its several policies, applied the methodology to the triggered policies and, from the resulting allocation, calculated the amount due from the reinsurers pursuant to the coverages provided under the applicable reinsurance contract.

At issue are Gerling's reinsurance payment for the settlement of claims at three sites: New Bedford Harbor, Sullivan's Ledge and Norwood. By July 1998, Gerling had paid Home a total of $3,099,996 in settlement of these claims and closed its files. According to Gerling, its auditors' subsequent review of Home's claim files in May 2000 revealed that Home had settled a FedPac claim with respect to an additional site, Santa Clara, but had not billed Gerling for a reinsurance payment. Further investigation revealed that Home would not have billed Gerling on the earlier New Bedford Harbor, Sullivan's Ledge and Norwood sites either except for the fact that Home's billings for those sites had been grossly miscalculated by incorporating incorrect factual data as to the number of policies actually triggered and the terms of the policies involved in Home's loss allocation. Gerling alleges that by misapplying its own allocation methodology, Home incorrectly placed millions of dollars of loss in the wrong policy years, while failing to place other millions of dollars of loss in the years where they properly belonged. According to Gerling, proper calculation of Home's allocation of the claims for the New Bedford Harbor, Sullivan's Ledge and Norwood sites would have resulted, as in the case of the Santa Clara site, in no billing as to any of the sites.

The particulars of the erroneous billings paid by Gerling are as follows. Home paid $4,300,000 to settle FedPac's environmental pollution claims in connection with the New Bedford Harbor site, receiving in exchange a release for all of Home's FedPac policies. Home allocated the entire settlement payment

equally to all of the annual periods during which, without a pollution exclusion, it provided coverage to FedPac. According to Gerling, Home's communications uniformly represented that it had issued policies without a pollution exclusion only for the six-year period of 1965-1971, that is, the years covered by the second and third policies. Accordingly, Home allocated $716,666 per year ($4,300,000 ÷ 6) to each of the six annual periods from July 1, 1965 through July 1, 1971, during which period Gerling provided annual reinsurance coverage, excess of $500,000, and submitted reinsurance billings to Gerling of $216,666 ($716,666 − $500,000) for each of the six years for a total of $1,299,996 ($216,666 × 6). Accepting as true Home's representation that it provided coverage without a pollution exclusion in only six years, Gerling paid the $1,299,996 billing on or about August 31, 1992 and closed its file.

As Gerling later learned, contrary to Home's billing representations, Home had, in fact, issued FedPac policies (the first, second and third) without a pollution exclusion covering nine, not six, years, for the period 1962 to 1971. Applying the loss properly against Home's allocation methodology, i.e. to all the policy years without a pollution exclusion, would result in an annual allocation of $477,777 ($4,300,000 ÷ 9) per year, an amount below Home's $500,000 retention under Gerling's facultative reinsurance. Thus, Gerling seeks $1,299,996, which, it argues, it paid as the result of a factual mistake incorporated into Home's computation of its own settlement allocation.

In connection with the Norwood site, while Home, unlike in New Bedford Harbor, did include the first policy in its allocation, it failed to identify which of its policies contained a "Non-Cumulation" clause, sometimes referred to as "Condition C."* This paragraph was the determinative provision under Home's method of allocation of the Norwood claim as well as the Sullivan's Ledge claim. For purposes of reinsurance allocation, Home applies Condition C as sweeping forward a continuous loss, such as the pollution losses at issue herein, into the earliest triggered Home policy containing such condition. The first, second and third policies all contained Condition C and, under

---

* Insofar as is relevant, Condition C provides:

"Subject to the foregoing paragraph and to all the other terms and conditions of this policy in the event that personal injury or property damage arising out of an occurrence covered hereunder is continuing at the time of termination of this policy The Company will continue to protect the Insured for liability in respect of such personal injury or property damage without payment of additional premium."

Home's method of allocation, the entire loss payment for Norwood should have been allocated to the first policy, which Gerling did not reinsure.

The underlying facts of the Norwood billing are as follows. In September 1996, Home paid $4,400,000 to settle the Norwood site pollution claims, receiving, in exchange, a release under all of Home's FedPac policies. Home advised Gerling that the $4,400,000 loss payment would initially be spread in equal portions of $1,466,666 ($4,400,000 ÷ 3) to each of the first, second and third policies. Home would then apply Condition C to sweep the loss forward into the earliest triggered Home policy containing such provision. Gerling claims that at the time Home was soliciting its agreement to the reinsurance billing, Home represented that "all policies but the first one contain Condition C," reconfirming yet again that "[the first policy] * * * does not contain Condition C." Before it paid the claim, Gerling requested explicit reconfirmation as to which of the policies contained Condition C. In response Home reconfirmed, without qualification, that "all policies except [the first policy] contain Condition C," reiterating that "[the second policy] and [the third policy] do contain Condition C." Accordingly, Home allocated $1,466,666 to the first policy, $2,933,332 to the second policy ($1,466,666 + $1,466,666 swept in from the third policy) and nothing to the third policy and billed Gerling $1,225,000 under two certificates of reinsurance covering portions of the second policy. Gerling paid $1,049,999.50 in satisfaction of the Norwood reinsurance billings, after receiving a 15% discount for its acceptance of Home's methodology with respect to the allocation of Condition C for purposes of the Norwood and Sullivan's Ledge claims. Since, in fact, the first policy contained Condition C, by virtue of Home's own methodology, all of the Norwood loss was allocable to the first policy, which Gerling did not reinsure.

Home claims that the Sullivan's Ledge billing was predicated on the same false premise as led to the improper Norwood billing. In or about July 1997, Home paid $3,000,000 to settle FedPac's environmental pollution claims in connection with the Sullivan's Ledge site, receiving, in exchange, a release under all three policies. Home advised Gerling of the settlement and its allocation methodology: the $3,000,000 loss payment would initially be allocated in equal portions of $1,000,000 ($3,000,000 ÷ 3) to each of the first, second and third policies, Home reaffirming that "all policies except [the first policy] contain Condition C." In accordance with the methodology used

in the Norwood site claims, Home allocated $1,000,000 to the first policy, $2,000,000 to the second policy ($1,000,000 + $1,000,000 swept in from the third policy) and nothing to the third policy and billed Gerling $875,000 under two reinsurance certificates covering portions of the second policy. Gerling paid $750,000 in satisfaction of the Sullivan's Ledge billing. Since the first policy did contain Condition C, as in the case of Norwood, all the loss was allocable solely to the first policy, which Gerling did not reinsure.

When Home rejected Gerling's demand for a refund of the monies alleged to have been mistakenly paid as a result of the aforementioned reinsurance billings, Gerling commenced this action seeking restitution, in equity, in the sum of $3,099,996. Home answered, asserting as an affirmative defense the agreement to arbitrate contained in the reinsurance agreements, and moved, successfully, to stay the action in favor of arbitration, resulting in the order on appeal. We reverse.

"It is well settled that a party cannot be compelled to submit to arbitration unless the agreement to arbitrate expressly and unequivocally encompasses the subject matter of the particular dispute" (*Matter of American Centennial Ins. Co. v Williams*, 233 AD2d 320, 320). The burden was on Home, the party seeking arbitration, to demonstrate a "clear and unequivocal" agreement to arbitrate Gerling's claim (*Matter of Siegel v 141 Bowery Corp.*, 51 AD2d 209, 212). Contrary to the motion court's determination that the dispute involves a matter of contract interpretation, we find that Home has failed to meet its burden of showing that the arbitration agreement encompasses the dispute in issue, the crux of which is aptly framed in Home's answer to the complaint: "Home admits that it has not issued corrected billings and/or refunded monies to Gerling as alleged in * * * the [c]omplaint. Home denies it has an obligation to do so." Whether Home has an obligation to refund the monies alleged to have been mistakenly paid turns, not on an interpretation of the reinsurance contracts, but, rather, on Home's method of allocating its excess insurance losses for purposes of reimbursement under the reinsurance certificates.

In fact, Home does not dispute that there were nine, not six, years in which a Home excess policy without a pollution exclusion covered FedPac and that it incorrectly calculated Gerling's billing by dividing the settlement amount by six, rather than nine, and that but for the mistake there would have been no reinsurance billing; nor does Home dispute that but for the mistake misidentifying the existence of Condition C in the first

policy there would have been no billing under Gerling's certificates for the Norwood and Sullivan's Ledge losses. In conceding the billing error, Home contends that it relied on inaccurate information. It is correctly calculating all prospective reinsurance billings on ongoing FedPac site settlements.

It is well recognized that the narrow wording of the arbitration clause at issue limits its application to differences over contract interpretation, and does not extend to any controversy arising thereunder. In *Associated Indem. Corp. v Home Ins. Co.* (19 F3d 1432 [table; text at 1994 WL 59001, 1994 US App LEXIS 3742 (6th Cir)]), Home urged an argument similar to the one raised here with respect to a dispute, which, like the instant one, did not turn on the interpretation of the terms of the reinsurance contract and involved an identical arbitration clause. The court concluded, "The language of the arbitration clause at issue is narrow and expressly applies solely to issues involving irreconcilable differences of opinion as to the interpretation of the language of the contract between the parties. Home has failed to identify any provision of the contract requiring interpretation, let alone arbitration. There is no duty to arbitrate [the dispute] in the absence of a *bona fide* issue of contract interpretation" (*id.*, 1994 WL at * 3, 1994 US App LEXIS at * 8).

The holding of *Associated Indemnity* was recently adopted by this Court in *Argonaut Ins. Co. v Travelers Ins. Co.* (295 AD2d 235), which found a clause providing for arbitration in the event that "an irreconcilable difference of opinion arises as to the interpretation of this [c]ontract" to be expressly applicable "only to issues pertaining to interpretation of the reinsurance certificates" (*id.* at 235, 236). This Court held that the motion court "correctly concluded that there had been no arbitrable matter identified, since defendant failed to specify any provision of the [reinsurance] certificates requiring interpretation" (*id.* at 236). As in *Argonaut*, Gerling's claim, on its face, does not turn on any interpretation of the facultative certificates, the provisions of which have not been placed in issue in this litigation.

Faced with this precedent, decided one year after entry of the order under review, Home, which argued before the motion court that the facultative certificates contained a provision "requiring that as a condition precedent to any right of action that Home and Gerling * * * submit their dispute to arbitration," takes the position that the Federal Arbitration Act [FAA] (9 USC § 1 *et seq.*), which establishes a strong policy in favor of

arbitration (*David L. Threlkeld & Co., Inc. v Metallgesellschaft Ltd. [London]*, 923 F2d 245, 248, *cert dismissed* 501 US 1267), applies and requires arbitration of this dispute. "Federal law applies to enforcement of a duty to arbitrate, whenever interstate commerce is involved." (*Guinness-Harp Corp. v Jos. Schlitz Brewing Co.*, 613 F2d 468, 472 [2nd Cir]; *Crespo v 160 W. End Ave. Owners Corp.*, 253 AD2d 28, 31.) Since insurance constitutes commerce within the meaning of the Commerce Clause (*United States v South-Eastern Underwriters Assn.*, 322 US 533, 553), it is beyond dispute that the reinsurance certificates at issue are contracts involving interstate commerce. Gerling is a foreign corporation. Home is a New Hampshire corporation authorized to conduct business in New York. The pollution sites are located in Massachusetts. FedPac is located in New Jersey and the reinsured risks included sites located in the United States, Canada, Germany and Austria.

When applicable, the FAA preempts inconsistent state law as to an arbitration agreement's enforceability (*see Matter of Smith Barney Shearson v Sacharow*, 91 NY2d 39, 48). The preemption, however, extends only to those provisions of state law that actually conflict with the FAA (*see Matter of Propulsora Ixtapa Sur [Omni Hotels Franchising Corp.]*, 211 AD2d 546, 548, *lv denied* 85 NY2d 805). "The liberal federal policy is not so broad that it compels the arbitration of issues beyond those agreed to by the parties" (*Associated Indem. Corp. v Home Ins. Co., supra,* 1994 WL 59001, *2, 1994 US App LEXIS 3742, *7). The FAA was not enacted to guarantee arbitration on demand in all circumstances, but to ensure rigorous enforcement of arbitration contracts (*see Matter of Smith Barney, Harris Upham & Co. v Luckie*, 85 NY2d 193, 201, *cert denied sub nom. Manhard v Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 516 US 811; *Matter of Salvano v Merrill Lynch, Pierce, Fenner & Smith*, 85 NY2d 173, 181). As the Court of Appeals for the Second Circuit has noted, "While federal policy generally favors arbitration, the obligation to arbitrate nevertheless remains a creature of contract" (*Louis Dreyfus Negoce S.A. v Blystad Shipping & Trading Inc.*, 252 F3d 218, 224, *cert denied* 534 US 1020). Thus, the mere invocation of the FAA does not operate to convert a nonarbitrable claim into an arbitrable one. "[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit" (*United Steelworkers of Am. v Warrior & Gulf Nav. Co.*, 363 US 574, 582).

In that regard, the Second Circuit's analysis of the distinction between a narrow and broad arbitration clause is instructive:

> "[I]f reviewing a narrow clause, the court must determine whether the dispute is over an issue that 'is on its face within the purview of the clause,' or over a collateral issue that is somehow connected to the main agreement that contains the arbitration clause. * * * Where the arbitration clause is narrow, a collateral matter will generally be ruled beyond its purview. * * * Where the arbitration clause is broad, 'there arises a presumption of arbitrability' and arbitration of even a collateral matter will be ordered if the claim alleged 'implicates issues of contract construction or the parties' rights and obligations under it.'" (*Louis Dreyfus Negoce S.A. v Blystad Shipping & Trading Inc.*, *supra*, 252 F3d at 224 [citations omitted].)

Here, on its face, Gerling's claim alleges no more than an error in billing and payment; it does not speak of fraud in the settlements or a breach of any certificate term. The claim is about Home's methods and processes of loss allocation and, as this record shows, involves a purely internal matter. As noted, the arbitration clause here is a narrow one, whose application is limited to differences over contract interpretation. The issues involved in the dispute fall outside of the narrow arbitration clause and squarely within the realm of nonarbitrable collateral issues that are, at best, "connected to the main agreement that contains the arbitration clause" (*id.*).

In urging that the dispute is arbitrable, Home relies upon sections 9 and 11 of the reinsurance contracts, arguing that Gerling is bound by the settlements between Home and Fed-Pac and that Gerling's liability is subject in all respects to the terms and conditions of the underlying policies to which the settlements relate. This argument proceeds on a false premise. Gerling is not objecting to Home's settlements of the claims under sections 9 and 11 of the certificates. Even if section 9, which provides that the liability of Gerling shall follow that of Home and is subject to the terms and condition of Home's policies, were to be read as incorporating, by reference, the terms of Home's policies into the reinsurance contracts (*cf. Progressive Cas. Ins. Co. v C.A. Reaseguradora Nacional De Venezuela*, 991 F2d 42 [2nd Cir]), nothing in the underlying policies bears on whether Home can allocate its New Bedford losses over

nine years, instead of six. As for Condition C, which is a policy provision, nothing in Condition C requires interpretation. Rather, the question is whether Home treated the first policy as not containing Condition C even though it did, as alleged, and, if so, what was its justification therefor. In any event, neither the underlying policy nor the reinsurance contracts can supply the justification. Section 11 of the reinsurance certificates is a "follow-the-fortune" clause, which merely provides that the reinsurer must accept any good faith settlement the reinsured makes with the insured (*see Insurance Co. of N. Am. v United States Fire Ins. Co.*, 67 Misc 2d 7, 9, *affd* 42 AD2d 1056). In no way does Gerling challenge Home's settlements with its insured, FedPac.

We have considered the other points raised by defendant and find that they are without merit.

Accordingly, the order of the Supreme Court, New York County (Charles Tejada, J.), entered June 13, 2001, granting defendant's motion to stay the action and compel arbitration, should be reversed, on the law, with costs and disbursements, and the motion denied.

MAZZARELLI, J.P., ANDRIAS and BUCKLEY, JJ., concur.

Order, Supreme Court, New York County, entered June 13, 2001, reversed, on the law, with costs and disbursements, and defendant's motion to stay the action and compel arbitration denied.