ADR/JB, CORP., Plaintiff,

v.

MCY III, INC., d/b/a Motor Life Distributors, Defendant.

No. 03 CV 2499(ADS)(ETB).

United States District Court, E.D. New York.

Jan. 23, 2004.

Stern, Adler & Associates, LLP by Janet S. Stern, Esq., Steven M. Adler, Esq., Westbury, NY, for Plaintiff.

Jaffe & Asher, LLP by Ira N. Glauber, Esq., New York City, for Defendant.

### MEMORANDUM OF DECISION AND ORDER

SPATT, District Judge.

On May 16, 2003, ADR/JB, Corp. ("ADR" or the "plaintiff") commenced this

action against MCY III, Inc. ("MCY" or the "defendant"), asserting four claims sounding in breach of contract. In response, MCY brings this motion to compel arbitration pursuant to the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.* (the "Act").

## I. BACKGROUND

MCY is the exclusive American manufacturer and distributor of automotive service equipment and chemicals marketed as the "Bilstein Engine Flush." ADR is in the business of selling automotive parts, oil additives, filters and lubricants, as well as servicing transmissions, power steering, radiator and engine flush machines.

### A. The Jobber Agreement

On March 8, 2001, MCY entered into a jobber agreement (the "Jobber Agreement") with ADR. Pursuant to this agreement, MCY granted ADR the exclusive right to market, distribute, sell and service the Bilstein Engine Flush Systems. The products covered by the Jobber Agreement included the Bilstein R–2000 Single Tank and Double Tank Flush Systems and "Forty Pack's" of chemicals, filters and related supplies (collectively, the "Bilstein Products"). The Jobber Agreement precluded ADR from selling Bilstein Products to any national accounts. Section 2(a) of the Jobber Agreement states, in relevant part:

> During the term of this Agreement the Distributor [MCY] hereby grants to the Jobber [ADR] and the Jobber hereby accepts the exclusive right within the Jobber's Territory to market, distribute, sell and service the Included Products, with the exception of Sonic Group, Group 1, and Asburry Group stores. MotorLife reserves the right to service and sell direct national accounts such as Midas and Jiffy Lube....

ADR's "Territory" consisted of the states of New York, New Jersey, Connecticut, and the City of Boston, Massachusetts. Under Section 3 of the Jobber Agreement, ADR agreed "to confine sale efforts for the Included Products to the Jobber's Territory" and not to "directly or indirectly, make any sales of Included Products outside the Jobber's Territory, unless it has received the written permission of the Distributor to engage in sales efforts outside the Jobber's Territory."

The term of the Jobber Agreement was initially for one year beginning April 17, 2001 and ending April 16, 2002. The agreement automatically renews itself for successive one year periods unless at least 90 days prior to the expiration of the one year term MCY or ADR gives notice in writing of its desire to terminate the agreement.

The parties agreed to arbitrate any disputes involving the Jobber Agreement. An arbitration clause in Section 16 of the Jobber Agreement states:

> Any controversy or claim arising out of or relating to this Agreement or breach hereof, shall be settled by arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association.... This Agreement shall be governed by the law of the State of California without regard to any otherwise applicable principles of conflicts of law.

### B. The Pep Boys Agreement

Shortly after the parties entered into the Jobber Agreement, ADR began negotiations with representatives of Pep Boys, an automotive parts and repair chain with at least 635 stores located throughout the country and with headquarters in Philadelphia, Pennsylvania. The plaintiff approached MCY with idea of getting Pep Boys as a customer. However, because

Pep Boys was a national account, ADR claims that the parties discussed the prospect of entering into a new agreement concerning Pep Boys.

ADR claims that, on July 13, 2001, MCY specifically authorized in writing that ADR had the right to sell certain Bilstein Products to Pep Boys. Thereafter, ADR aggressively campaigned to promote the Bilstein Products to Pep Boys. On or about October 12, 2001, ADR and Pep Boys entered into a Confidentiality and Non–Disclosure Agreement concerning the possible sale, delivery, and service of the Bilstein Products to Pep Boys. The plaintiff further asserts that, on October 24, 2001, the defendant specifically advised Pep Boys in writing that ADR was authorized to sell, deliver, supply, and service all of the Pep Boys needs nationwide only with regard to certain Bilstein Products.

In April 2002, the defendant demanded that it become more involved in the final negotiations between ADR and Pep Boys. MCY also informed ADR that it no longer wanted the plaintiff to have the right to sell Bilstein Products nationwide to the 635 Pep Boys stores, but instead only to the 281 Pep Boys stores located East of the Mississippi. The plaintiff asserts that an agreement, dated April 23, 2002 (the "Pep Boys Agreement"), recognized that ADR would service the 281 Pep Boys stores. In particular, the agreement states, in pertinent part:

> [T]his shall serve as a "deal memo" to be followed later by a Service Agreement specifically recognizing that ADR shall service each and all of the Pep Boys stores east of the Mississippi, even though Pep Boys is a national account as defined in the [Jobber] Agreement dated March 8, 2001 between us, in the hopes that the program I have negotiated with Pep Boys will be successful for the customer and for each of us.

Shortly after the execution of the Pep Boys Agreement, the plaintiff claims that Marty C. Yacobian, CEO of MCY, denied that the agreement existed and informed Ari Yemimi, president of ADR, that it would not be paid any commissions on the Pep Boys account. In addition, the plaintiff asserts that Yacobian threatened Yemini that if he interfered with the Pep Boys account, ADR would lose all of its rights under the Jobber Agreement. ADR claims that MCY began an aggressive campaign against ADR in an attempt to cancel the Jobber Agreement and avoid paying ADR its commissions under the Pep Boys Agreement. In December 2002, ADR learned that Pep Boys was ordering Bilstein Products directly from MCY. On April 17, 2003, the defendant advised ADR in writing that the Jobber Agreement with ADR had been terminated due to ADR's failure to correct breaches of that agreement.

On May 16, 2003, the plaintiff commenced this action asserting four breach of contract claims arising from the Pep Boys Agreement. On June 27, 2003, the defendant commenced an arbitration proceeding in California before the American Arbitration Association. In the arbitration proceeding, the defendant alleges that ADR breached the Jobber Agreement by, among other things, failing to properly service Bilstein Products in its territory.

MCY brings this motion to compel arbitration of the issues in this case, arguing that the Pep Boys Agreement was only a "deal memo" and "outline" that contemplated a future service agreement that was never finalized due to ADR's own failures. The defendant also argues that the plaintiff's claims are governed by the arbitration clause in the Jobber Agreement because the Pep Boys Agreement merely amended the Jobber Agreement. In addition, the defendant moves for sanctions to

be imposed on ADR and its counsel in the amount of the defendant's costs and attorney's fees.

In response, the plaintiff contends that the Pep Boys Agreement is not subject to the arbitration clause in the Jobber Agreement because the Pep Boys Agreement is a collateral agreement and that the claims asserted in the complaint do not arise under the Jobber Agreement. The plaintiff also moves for leave to file a sur-reply.

## II. DISCUSSION

### A. The Defendant's Motion to Compel Arbitration

■ The Federal Arbitration Act provides that arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. There is a strong federal policy favoring arbitration, and any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration. *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 25, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991); *Opals on Ice Lingerie v. Body Lines, Inc.*, 320 F.3d 362, 369 (2d Cir.2003). Indeed, the Act " 'leaves no place for the exercise of discretion by the district court, but instead mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed.' " *WorldCrisa Corp. v. Armstrong*, 129 F.3d 71 (2d Cir.1997) (quoting *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 218, 105 S.Ct. 1238, 84 L.Ed.2d 158 (1985)).

■ In determining whether to compel arbitration, a court must decide: "(1) whether the parties agreed to arbitrate disputes at all; and (2) whether the dispute at issue comes within the scope of the arbitration agreement." *ACE Capital Re Overseas Ltd.v. Central United Life Ins. Co.*, 307 F.3d 24, 29 (2d Cir.2002) (citing *Hartford Accident & Indem. Co. v. Swiss Reinsurance Am. Corp.*, 246 F.3d 219, 226 (2d Cir.2001)). Because the plaintiff concedes that the Jobber Agreement contained a valid arbitration clause, the Court must consider whether the arbitration agreement encompasses the plaintiff's claims.

■ To determine whether the claims asserted in the complaint fall within the scope of an arbitration clause, the Court must "classify the particular clause as either broad or narrow." *Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc.*, 252 F.3d 218, 224 (2d Cir.2001). An arbitration clause that contains the phrase "any claim or controversy arising out of or relating to the agreement" is considered "the paradigm of a broad clause." *Collins & Aikman Prods. Co. v. Bldg. Sys. Inc.*, 58 F.3d 16, 20 (2d Cir. 1995). This language is nearly identical to the instant clause which requires arbitration of "any controversy or claim arising out of or relating to this Agreement or breach thereof." This arbitration clause therefore is construed as being "broad."

■ Where, as here, the arbitration clause is broad, there is a presumption of arbitrability. *Id.* at 23. As such, the burden shifts to "the party resisting arbitration to demonstrate that the disputed issue is collateral." *ACE Capital Re Overseas Ltd. v. United Life Ins. Co.*, 307 F.3d 24, 34 (2d Cir.2002) (citation omitted). Even if the dispute is clearly collateral to the principal contract containing an arbitration clause, the claims alleged will be arbitrated if they implicate "issues of contract construction or the parties' rights and obligations under it." *Collins*, 58 F.3d at 23. "When parties use expansive language in drafting an arbitration clause, presumably they intend all issues that 'touch matters'

within the main agreement to be arbitrated...." *Louis Dreyfus Negoce*, 252 F.3d at 225 (internal citation omitted).

■ Here, ADR has demonstrated that the Pep Boys Agreement is a collateral side agreement. A collateral agreement is "a separate side agreement, connected with the principal contract which contains the arbitration clause." *Id.* at 228 (quoting *Prudential Lines, Inc. v. Exxon Corp.*, 704 F.2d 59, 64 (2d Cir.1983)). The Court notes first that the Pep Boys Agreement was written after the Jobber Agreement. In addition, the Pep Boys Agreement does not specifically state that it is a supplement or an amendment to the Jobber Agreement. In addition, the Pep Boys Agreement does not explicitly incorporate any of the terms of the Jobber Agreement. Nor does the Jobber Agreement explicitly incorporate any of the terms of the Pep Boys Agreement. *See Louis Dreyfus Negoce*, 252 F.3d at 228–29. Thus, the Court rejects MCY's argument that the Pep Boys Agreement merely amended the Jobber Agreement.

■ Having determined that the Pep Boys Agreement is collateral, the Court next examines whether it falls within the scope of the arbitration clause because it implicates the rights and obligations of the parties under the Jobber Agreement. In making this determination, the Court must "focus on the factual allegations in the complaint rather than the legal causes of action asserted. If the allegations underlying the claims 'touch matters' covered by the parties' [principal] agreement, then those claims must be arbitrated, whatever the labels attached to them." *Genesco, Inc. v. T. Kakiuchi & Co.*, 815 F.2d 840, 846 (2d Cir.1987) (citation omitted).

After reviewing the complaint, the Jobber Agreement, and the Pep Boys Agreement, the Court concludes that the plaintiff's allegations fall within the scope of the

arbitration clause. In the complaint, ADR asserts breach of contract claims arising from the Pep Boys Agreement, which permitted ADR to market and sell to a national account, despite the express wording of the Jobber Agreement in which MCY reserved to itself the exclusive right to market and sell to national accounts. ADR claims that MCY marketed and sold machines, services and other products to Pep Boys but did not give ADR any commissions for these sales and has not allowed ADR to service the machines MCY sold to Pep Boys.

The plaintiff's claims implicate Section 3 of the Jobber Agreement which states that the "Jobber agrees to confine sales efforts for the Included Products to the Jobber's Territory, and shall not, directly or indirectly, make any sales of Included Products outside the Jobber's Territory, unless it has received the written permission of the Distributor to engage in sales efforts outside the Jobber's Territory." This section requires written consent before ADR distributes and sells outside ADR's Territory. The complaint alleges that "on July 13, 2001, [MCY] specifically authorized ADR, in writing, that ADR had the right to sell Bilstein Engine Flush Machines and Bilstein solution to Pep Boys." The plaintiff further alleges in its complaint that the parties also executed the Pep Boys Agreement which expressly authorized ADR to sell and service Bilstein Products outside of its Territory.

A decision on the plaintiff's claims would first necessitate a determination of whether MCY in fact gave ADR written permission to sell the Bilstein Products pursuant to Section 3 of the Jobber Agreement. The allegations in the complaint "touch matters" covered by and implicate the rights and obligations of the parties under the Jobber Agreement. Resolution of this case would be difficult without examining, understanding, and interpreting the terms

of the Jobber Agreement. Thus, given the strong presumption of arbitrability created by the broad arbitration clause, and bearing in mind that any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, the Court finds that ADR's breach of contract claims are arbitrable. Accordingly, the Court grants the defendant's motion to compel arbitration. As such, this action is stayed pending the resolution of arbitration proceeding. *See In re Currency Conversion Fee Antitrust Litig.,* MDL No. 1409, 2003 U.S. Dist. LEXIS 11218, at \*30 (S.D.N.Y. July 3, 2003) ("Section 3 of the FAA provides that the court must stay any suit or proceeding until arbitration has been completed if the action concerns any issue referable to arbitration under a written agreement for such arbitration.").

### B.  The Plaintiff's Motion for Leave to File Sur–Reply

 ADR seeks leave to file a sur-reply in further opposition to MCY's motion to compel arbitration. Having reviewed the defendant's reply in support of the instant motion, the Court finds it raises no arguments or issues that could not have been considered by ADR in its opposition papers. *See Litton Indus. v. Lehman Bros. Kuhn Loeb, Inc.,* 767 F.Supp. 1220, 1235 (S.D.N.Y.1991) In addition, the defendant's reply papers merely addressed issues the plaintiff raised in its opposition papers. *Id.* ("Clearly, reply papers may properly address new material issues raised in opposition papers so as to avoid giving unfair advantage to the answering party who took it upon himself to argue those previously unforeseen issues.") Thus, the plaintiff's motion for leave to file a sur-reply is denied.

### C.  The Defendant's Motion for Sanctions

 Pursuant to Rule 11, MCY moves for sanctions to be imposed on ADR and its counsel in the amount of the defendant's costs and attorney's fees because of ADR's decision to proceed with litigation rather than arbitration. Sanctions are generally warranted where a pleading has been interposed for improper purposes, or where the pleading is not well grounded in fact or not warranted by existing law. Fed.R.Civ.P. 11. The imposition of Rule 11 sanctions is within the discretion of the court and should be done with caution. *See Caisse Nationale de Credit Agricole– CNCA v. Valcorp.,* 28 F.3d 259, 264 (2d Cir.1994).

In this case, the filing of the pleadings was not patently unreasonable. Nor is there any evidence that the plaintiff commenced this action for any improper purpose. *See Rodick v. City of Schenectady,* 1 F.3d 1341, 1350 (2d Cir.1993) (cautioning that sanctions should only be imposed "if it is patently clear that a claim has absolutely no chance of success"). Therefore, the Court denies MCY's motion for sanctions.

### III.   CONCLUSION

Based on the foregoing, it is hereby

**ORDERED,** that the defendant's motion to compel arbitration is **GRANTED**; and it is further

**ORDERED,** that the plaintiff's motion for leave to file a sur-reply is **DENIED**; and it is further

**ORDERED,** that the defendant's motion for sanctions is **DENIED**; and it is further

**ORDERED,** that this action is stayed pending the conclusion of the arbitration proceeding.

**SO ORDERED.**