[Cite as *Kettering Health Network v. Caresource*, 2014-Ohio-956.]

IN THE COURT OF APPEALS FOR MONTGOMERY COUNTY, OHIO

KETTERING HEALTH NETWORK          :

     Plaintiff-Appellant          :          C.A. CASE NO.    25928

v.          :          T.C. NO.    13CV2016

CARESOURCE          :          (Civil appeal from
                                                    Common Pleas Court)

     Defendant-Appellee          :

:

· · · · · · · · · ·

**O P I N I O N**

Rendered on the     14th     day of      March     , 2014.

· · · · · · · · · ·

GARY J. LEPPLA, Atty. Reg. No. 0017172 and PHILIP J. LEPPLA, Atty. Reg. No. 0089075, 2100 S. Patterson Blvd., Dayton, Ohio 45409
       Attorneys for Plaintiff-Appellant

MARK R. CHILSON, Atty. Reg. No. 0016511 and ANDREW J. REITZ, Atty. Reg. No. 0076858, 230 N. Main Street, Dayton, Ohio 45402
       Attorneys for Defendant-Appellee

· · · · · · · · · ·

DONOVAN, J.

    **{¶ 1}**    This matter is before the Court on the Notice of Appeal of Kettering Health

Network ("KHN"), filed September 23, 2013. KHN appeals from the August 27, 2013 decision of the trial court that sustained CareSource's motion to compel arbitration. We hereby affirm the judgment of the trial court.

{¶ 2}  On March 30, 2013, KHN filed a Complaint for Damages, Declaratory Judgment and to Compel Partial Arbitration against CareSource. The complaint provides that CareSource is a managed care payer "that has contracted with and is paid by the Ohio Department of Job and Family Services ('ODJFS') to administer Medicaid payment and services for certain Ohio Medicaid beneficiaries."  According to the complaint, "CareSource obtains compensation in a set amount per beneficiary from the State of Ohio to administer the aforementioned Medicaid program."  KHN asserted that it and CareSource "entered into a Participating Hospital Master Contract, effective June 12, 1987, which requires KHN to provide medical care and services to CareSource beneficiaries in exchange for CareSource paying Kettering pursuant to the fully and freely negotiated terms of the agreement ('the 1987 Contract.') * * *."

{¶ 3}  KHN further alleges that the "1987 Contract was subsequently modified several times through various amendments and addenda. Effective July 1, 2005, [KHN] and CareSource entered into a new Hospital Agreement ('the 2005 Contract') * * * ." According to KHN, both "the 1987 Contract and the 2005 Contract have consistently and expressly required CareSource to pay [KHN] for outpatient services in amounts equivalent to the then-prevailing Ohio Medicaid rates."  KHN asserts that the "dispute resolution mechanism set forth in the 1987 Contract provides for a right of access by the provider ([KHN]) to a court of law for resolution of claims," while the 2005 Contract provides, "in

paragraph 7.11, that dispute resolution shall occur in a fashion consistent with 'the dispute resolution procedures *described* in the arbitration proceedings' utilized by American Health Lawyers Association (AHLA)(emphasis added)."

**{¶ 4}** According to KHN, through "the end of 2011, CareSource has systematically and deliberately departed from Ohio's Medicaid guidelines for payment of claims containing unlisted surgical procedure codes, having administratively imposed a 'methodology' of payment at a rate far lower than that provided by contract and law, and had for an extended period of time concealed its activities in doing so." The complaint provides that "[a]s a matter of law, Medicaid rates for claims containing unlisted surgical procedure codes require the claim to be paid at the rate of 69% of the billed charge excluding separately payable line items for radiology, pregnancy, and laboratory codes, however CareSouce has ignored that mandate and instead claimed it had 'administratively' modified the rate with no notice" to KHN. According to KHN, since 2008, "when [KHN] obtained the technological ability to identify the deliberate CareSource underpayment of claims, it has consistently and repeatedly objected to such underpayments, sought compensation for underpayments, and engaged in an extended effort to resolve claims with CareSource, all with no success." KHN asserts that the "total of claims underpaid by CareSource to [KHN] equals $4,060,967.05."

**{¶ 5}** In its first claim for relief, KHN asserts that CareSource owes it "the sum of $4,060,967.05." KHN, in reliance upon Exhibit V(5) of the 1987 Contract, asserts that "the agreement between the parties provides that upon exhaustion of a grievance process, which was followed by failed mediation, the plaintiff health care provider is entitled to pursue

payment in a court of law." In its second claim for relief, KHN "requests that the Court issue a declaratory judgment indicating the availability of arbitration and the process to be followed." In its third claim for relief, KHN "demands arbitration of all claims which are subject to arbitration as the Court deems appropriate pursuant to the Second Claim for Relief."

**{¶ 6}** The 1987 Contract and the 2005 Contract are attached to KHN's complaint. We note that Article 7.6 of the 2005 Contract provides as follows:

> 7.6 <u>Entire Agreement</u>. This Agreement, Attachments, and Amendments hereto contain all the terms and conditions agreed upon by the parties and supersedes all other agreements, express or implied, regarding the subject matter hereof. Any amendments hereto and the terms contained therein shall supersede those of other parts of the Agreement in the event of a conflict.

**{¶ 7}** Article 7.11 of the 2005 Contract provides as follows:

> 7.11 <u>Dispute Resolution</u>. The parties shall resolve complaints, grievances or disputes arising between parties unless otherwise specified in Article 5.6, in accordance with the dispute resolution procedures described in the arbitration proceedings of the American Health Lawyers Association. All arbitrations shall be held in Montgomery County, Ohio.

**{¶ 8}** Article 7.6 of the 1987 Agreement provides as follows:

> 7.6 <u>Entire Agreement</u>. This Agreement and Exhibits hereto shall constitute the entire agreement between the parties regarding the subject

matter hereof. Each party acknowledges that no representation, inducement, promise or agreement has been made, orally or otherwise, by the other party or by anyone acting on behalf of the other party, unless such representation, inducement, promise, or agreement is embodied in this Agreement. There are no third party beneficiaries of this Agreement.

{¶ 9} Finally, we note that Exhibit V(5) of the 1987 Contract, entitled "DAYTON AREA HEALTH PLAN PROVIDER GRIEVANCE PROCEDURE," provides that upon exhaustion of such grievance procedure, "the provider shall have the right to pursue its rights in court or through any applicable state or federal agency."

{¶ 10} On April 15, 2013, CareSource filed its Motion of Defendant to Compel Arbitration and an Award of Attorney's Fees, as well as a motion for an order to stay an answer date, in which it asserts that the Ohio Arbitration Act and the Federal Arbitration Act mandate that the parties' arbitration agreement be enforced. On April 17, 2013, the Court issued an Order and Entry Sustaining Defendant's Motion to Stay an Answer Date and Setting Submission Dates on Defendant's Motion to Compel Arbitration and an Award of Attorney's Fees. On May 1, 2013, KHN filed a responsive memorandum to CareSource's motion to compel arbitration, and on May 7, 2013, CareSource filed a memorandum in reply.

{¶ 11} On July 17, 2013, KHN filed a Hearing Memorandum with Affidavits. The affidavit of Barbara Roberts provides that she is the "Manager of Contract Compliance at [KHN]," and that she has "personal knowledge of past and existing contracts between CareSource and [KHN]." Roberts authenticated the copies of the 1987 and 2005

Agreements attached to the complaint. Two exhibits, each setting forth "CareSource Underpaid Claims Listing," are attached to Roberts' affidavit, and Roberts avers that all "claims by [KHN] set forth in Exhibit A * * * involve services provided by [KHN] **prior to** the effective date of the 2005 contract between the parties hereto," and all "claims by [KHN] set forth in Exhibit B * * * involve services provided by [KHN] **on or subsequent to** the effective date of the 2005 contract between the parties hereto."

{¶ 12} The affidavit of Daniel Haibach provides that he "was employed as Director of Managed Care and MSO Services at [KHN] from 2002 through 2006 with responsibilities for contract negotiation including responsibility for oversight and negotiation of the 2005 contract between" the parties. He avers that he "kept careful track of the negotiations, changes, red-line drafts, and conversations regarding the negotiation and execution of the aforementioned 2005 contract." Haibach avers that the "initial draft document and template which was utilized in the 2005 negotiations was prepared and submitted to KHN by CareSource." Haibach avers that his "understanding, and the understanding of our KHN contract negotiating team, was that paragraph 7.6 applied to matters beginning July 1, 2005 and thereafter but not prior thereto." According to Haibach, "the language contained in paragraph 7.11, regarding dispute resolution, boilerplate language prepared and submitted to KHN by CareSource, and was intended to apply to claims for services rendered under the new contract in the understanding of myself and the KHN contract negotiating team." (Sic) Finally, Haibach avers as follows:

* * * in all my dealings with respect to the 2005 contract, based upon

my personal knowledge obtained through my intimate involvement in the

negotiations and the ultimate execution of the 2005 agreement, there was never a discussion of agreeing to any provisions, including mandatory arbitration, which would in any way impact claims involving services provided by KHN prior to July 1, 2005.

{¶ 13}   The record reflects that on July 18, 2013, the court conducted an abbreviated evidentiary hearing, in which it noted, after summarizing the parties' respective filings to date, that "it's the court's understanding, though, neither side feels the necessity of calling any witnesses; that the Court will simply go forward with considering these affidavits that have been filed as well as the memorandum that was filed on July 17 by Mr. Leppla."   The court noted that, "as we agreed in chambers," CareSource would file a memorandum responsive to KHN's July 17, 2013 filing, and that KHN would file a reply, at which time "the matter will be ripe for the court's decision."

{¶ 14}   On July 25, 2013, CareSource filed a Memorandum of Defendant CareSource in Opposition to a Hearing Memorandum with Affidavits by Plaintiff Kettering Health Network.   On July 30, KHN filed a reply thereto.

{¶ 15}   In its August 27, 2013 decision in favor of CareSource, the trial court determined that the issue before it "is whether or not Article 7.6 of what the court identifies as the '2005 Agreement' is ambiguous, and whether Article 7.11 of the 2005 Agreement requiring arbitration supersedes the effect of what the Court identifies as the '1987 Agreement.'"

{¶ 16}   The court initially noted that it "is well established that Ohio and federal courts encourage arbitration to settle disputes between parties, whereby there exists a strong

presumption in favor of arbitration." The court noted that in Ohio, "written arbitration agreements 'shall be valid, irrevocable, and enforceable, except upon grounds that exist at law or in equity for the revocation of any contract.' * * * ." The court also noted that the Ohio Supreme Court has "also recognized that 'arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed to submit.' * * * ." The court concluded that therefore, "the favor of the Ohio legislature and judiciary towards arbitration is tempered by the recognition that the parties themselves control the use of arbitration by the terms of the contracts."

{¶ 17} The trial court relied upon this Court's decision in *Garcia v. Wayne Homes, LLC*, 2d Dist. Clark No. 2001 CA 53, 2002-Ohio-1884,*9 for guidance in contract interpretation as follows:

> * * * [A]n arbitration clause in a contract is generally viewed as an expression that the parties agree to arbitrate disagreements within the scope of the arbitration clause and gives rise to a presumption that the grievance is arbitrable unless there exists the most forceful of evidence of a purpose to exclude the claim from arbitration. "As a matter of law, any doubts [or ambiguities] concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." A court should not deny arbitration of a claim

unless it is clear that the clause is not susceptible of an interpretation that covers the asserted dispute, with any doubts resolved in favor of arbitration.

{¶ 18}   The trial court noted that "[s]imilarly, the court's holding must comport with the standard articulated in *Academy of Medicine of Cincinnati v. Aetna Health, Inc*., [108 Ohio St.3d 185, 2006-Ohio-657, 842 N.E.2d 488, ¶ 6], wherein the Supreme Court of Ohio held that Ohio Courts may determine whether a cause of action is within the scope of an arbitration agreement based on the federal standard found in *Fazio v. Lehman Bros., Inc."*  [340 F.3d 386, 395 (6th Cir. 2003).] The court noted that *"Fazio* held that a '[a] proper method of analysis here is to ask if an action could be maintained without reference to the contract or relationship at issue.  If it could, it is likely outside the scope of the arbitration agreement.' * * * ."  Citing *Academy of Medicine of Cincinnati*, ¶ 29,   the court noted that this "test 'allows courts to make determinations of arbitrability based upon factual allegations in the complaint instead of on the legal theories presented' and 'establishes that the existence of a contract between the parties does not mean that every dispute between the parties is arbitrable.'"  The court then quoted *Academy of Medicine of Cincinnati*, ¶ 18, as follows:

"To determine whether the claims asserted in the complaint fall within the scope of an arbitration clause, the Court must 'classify the particular clause as either broad or narrow.'  *Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc.*, 252 F.3d 218, 224 (2d Cir. 2001).  An arbitration clause that contains the phrase 'any claim or controversy arising out of or relating to the

agreement' is considered 'the paradigm of a broad clause.' *Collins & Aikman Prods. Co. v. Bldg. Sys. Inc.*, 58 F.3d 16, 20 (2d Cir. 1995)." *ADR/JB Corp. v. MCY III, Inc.* (E.D.N.Y. 2004), 299 F.Supp.2d 110, 114. The arbitration provision in this case purports to cover any disputes about the parties' business relationship and must be considered a broad clause.

**{¶ 19}** The court noted that if "the arbitration provision is determined to be narrow, it is to be strictly construed as to the matters which are included within the requirement to arbitrate. * * * ." The court further determined, however, that "even the presence of a broad arbitration clause does not make all claims subject to arbitration. The court must still ask if the parties agreed to arbitrate the issue at hand." The court's decision provides that "when read in context of the entire section of the contract and surrounding sentences, the arbitration clause is susceptible to multiple interpretations because 'the actual placement or typography of the words in the printed contract, as well as the structure and punctuation used in drafting the contract, must be considered along with the words themselves.' * * *." The court further noted that, "if there exist defects in a contract that renders it ambiguous, consideration of parol evidence may thereafter be required. * * *." The court found, "[n]onetheless, 'if a dispute even arguably falls within the arbitration provision, the trial court must stay the proceedings until arbitration has been completed.' * * * ."

**{¶ 20}** The court continued its analysis as follows:

The Court finds it to be indisputable that all claims between the parties that arose subsequent to the 2005 Agreement are to be arbitrated in accordance with

Article 7.11 of the 2005 Agreement. There is no doubt as to the parties' intention to arbitrate the entirety of such claims as clearly specified in Article 7.11, as both parties concede in their respective arguments. However, the Court finds there to be doubt surrounding the parties' intentions as to the retroactive effect of Article 7.6 of the 2005 Agreement. Because the 1987 Agreement does not contain an arbitration clause, there can be no *isolated* presumption favoring arbitration as to all claims prior to the 2005 Agreement. Although the arbitration provision contained in the 2005 Agreement covers "complaints, grievances or disputes arising between the parties" and is found by the Court to be "broad," the Court finds that such a determination does not necessarily establish the parties' intent that an integration clause contained in a subsequent contract between the same parties assume precedence and retroactively affects the entirety of claims associated to the parties' original agreement. Therefore, the Court must necessarily examine the contractual language contained in each Article to ascertain the intent of the parties.

{¶ 21} The court focused on the following language in Article 7.6 of the 1987 Agreement: "This Agreement and Exhibits hereto *shall constitute the entire agreement between the parties regarding the subject matter hereof*," and it focused on the following language in Article 7.6 of the 2005 Agreement: "This Agreement, Attachments, and Amendments hereto contain all the terms and conditions agreed upon by the parties *and supersedes all other agreements, express or implied, regarding the subject matter hereof*." The court then reasoned as follows:

Upon review of the aforesaid Articles, the Court finds that there still remains doubt as to the retroactive effect of Article 7.6 of the 2005 Agreement. Although the parties have expressly made distinctions among the **A**greement and *a*greement terms contained within each respective Article, Article 7.6 of the 2005 Agreement fails to acknowledge any other such **A**greement that may have existed. However, Article 7.6 of the 2005 Agreement is the sole Article that contains "supersed[ing]" language, from which the Court finds there to exist dual interpretations as to its retroactive effect in consideration of [KHN's] assertion that "[*b*]*oth the 1987 Contract and the 2005 Contract* have consistently and expressly required CareSource to pay [KHN] for outpatient services in amounts equivalent to the then-prevailing Ohio Medicaid rates[,]" and therefore is interpreted to be "the subject matter hereof" within Article 7.6 of the 2005 Agreement. * * * In finding that there remains ambiguity surrounding the retroactive effect of Article 7.6 of the 2005 Agreement, the Court now reviews the *Affidavits of Daniel Haibach* and *Barbara Roberts* as parol evidence.

Upon review of the *Affidavits of Daniel Haibach and Barbara Roberts*, the Court is still not convinced that such evidence supersedes Ohio's strong presumption in favor of arbitration. Although both affidavits consist of statements from individuals with personal knowledge of past and current oversight and contract negotiations between [KHN] and CareSource, the Court finds that such evidence does not encompass "the most forceful evidence of a purpose to exclude the claim from arbitration." The Court finds that there remains doubt as to the effect of Article 7.6 of the 2005 [Agreement], and is therefore susceptible to

CareSource's interpretation that it encompasses retroactive effect of the 1987 Agreement. Such findings necessitate that the Court rule in favor of the general presumption in favor of arbitration. Therefore, the Court hereby stays all proceedings in the instant action, including CareSource's motion for attorney's fees pursuant to Civ.R. 11 and R.C. 2323.51, and further compels [KHN] to arbitrate all claims it has against CareSource arising from both the 1987 Agreement and the 2005 Agreement pursuant to Article 7.11 of the 2005 Agreement.

* * *

**{¶ 22}** KHN asserts one assignment of error herein as follows:

"THE TRIAL COURT ERRED WHEN IT COMPELLED ARBITRATION OF THE ENTIRE DISPUTE BETWEEN [KHN] AND CARESOURCE, INCLUDING MATTERS PREDATING A JULY 1, 2005 CONTRACTUAL ARBITRATION PROVISION."

**{¶ 23}** Regarding Article 7.6 of the 2005 Agreement, KHN asserts that it "is boilerplate. It is undisputed that the language was drafted and provided by CareSource." KHN asserts that the "language '*regarding the subject matter hereof*'" is probably the key to interpretation of Article 7.6" of the 2005 Agreement. According to KHN, "the 2005 Agreement was intended to govern all claims arising on the 'effective' date and into the future, because that in fact is what the 'subject matter' is in the 2005 Agreement." KHN asserts that a "new contract does not supersede all prior contracts simply because it contains a boilerplate integration clause that is meant to represent the parol evidence rule within that contract."

**{¶ 24}** KHN asserts, "[a]lternatively, insofar as counsel for the parties each present

different interpretations of the same language in the 2005 Agreement, and the trial court expressly found that the language was ambiguous, appropriate rules of construction must be considered. Indeed, the trial court considered KHN's affidavits accompanying its hearing memorandum." KHN asserts that "the intent of the negotiators [of the 2005 Agreement] was NOT to supersede the 1987 Contract." KHN argues that the language of the 2005 Agreement must be construed against CareSource, since it selected the language, and "the evidence of the intent of the parties must be considered." KHN asserts that the affidavits of Daniel Haibach and Barbara Roberts "demonstrate when the services were provided and under which contract they were provided."

{¶ 25} KHN asserts as follows:

As a further illustration, Attachment A.1 to the 2005 Agreement, entitled Reimbursement and Compensation, Kettering Medical Center Network, **Effective 07/01/2005**, contains language providing, "For medically necessary Covered Services rendered to Members by Hospital in accordance with the terms of this Agreement . . .". Based upon a simple reading of Attachment A.1 to the 2005 Agreement, in conjunction with the "Effective Date" listed, 07/01/2005, it is clear that the purpose of the 2005 Agreement and its "subject matter" were forward looking, not meant to be applied retroactively to claims that preexisted the "Effective Date" of 07/01/2005. Imagine that the reimbursement rates had by now risen as they pertain to the subject claims. In that instance, according to CareSource's argument, 2005 rates would be applied to the claims before the 2005 Agreement became effective, but that were not billed until after the new contract,

an unlikely CareSource argument.

{¶ 26} Finally, KHN asserts that the the parties "should only arbitrate the claims that were intended to be arbitrated and litigate the claims that are not covered by the 2005 Agreement, which are expressly made subject to litigation in the 1987 Contract. All claims for services rendered by KHN prior to the effective date of the 2005 Agreement were not intended to be covered under the 2005 Agreement's arbitration clause."

{¶ 27} CareSource asserts that an abuse of discretion is the appropriate standard of review, and that Sections 7.11 and 7.6 of the 2005 Agreement require all of KHN's claims in this dispute to be arbitrated. According to CareSource, "Section 7.11 does not contain date restrictions, is not date sensitive or time specific, does not reference any specific agreement, and is not limited to disputes under a specific agreement." CareSource asserts that "Section 7.11 was drafted to be an intentionally broad clause that covers 'all complaints, grievances or disputes arising between the parties,' regardless of whether the dispute arose before 2005 or after 2005, or whether it arose under any specific agreement, or under no agreement whatsoever." CareSource asserts that the integration clause contained in Section 7.6 of the 2005 Agreement makes clear that the 2005 Agreement supersedes the 1987 Agreement, and that all "courts rely on the plain meaning of contracts to interpret the parties' intent."

{¶ 28} CareSource further asserts that the Ohio Arbitration Act, the Federal Arbitration Act, and Ohio's strong presumption in favor of arbitration require KHN to arbitrate all of its claims herein. According to CareSource, the "affidavits introduced by KHN do not meet the heavy burden of rebutting the presumption that all of the claims in this case must be arbitrated."

{¶ 29} In Reply, KHN asserts that the "application of public policy arguments to

undermine a contract constitutes an abuse of discretion. However, the arbitrability of a claim is a question of law, which is subject to *de novo* review on appeal." KHN asserts that a "new contract does not supersede all prior contracts simply because it contains a boilerplate integration clause that is meant to represent the parol evidence rule within that contract." KHN asserts that if the 2005 Agreement is ambiguous, appropriate rules of contract construction must be considered.

**{¶ 30}** As this Court recently noted:

"Ohio has long had a strong public policy favoring arbitration." *Haight v. Cheap Escape Co.*, 2d Dist. Montgomery No. 25345, 2013-Ohio-182, ¶ 10, citing *Schaeffer v. Allstate Ins. Co.*, 63 Ohio St.3d 708, 711, 590 N.E.2d 1242, 1245 (1992). Arbitration is favored because it allows parties to bypass expensive and time-consuming litigation and "provides the parties thereto with a relatively expeditious and economical means of resolving a dispute." *Id.*, *Schaeffer* at 712, 590 N.E.2d 1242.

Ohio's public policy favoring arbitration is codified at R.C. Chapter 2711. Under R.C. 2711.02(A), a written arbitration clause "shall be valid, irrevocable, and enforceable, except upon grounds that exist at law or in equity for the revocation of any contract." This language tracks Section 2 of the Federal Arbitration Act, which provides: "[A] contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract * * * shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." *Taylor v. Ernst*

*and Young*, *L.L.P.*, 130 Ohio St.3d 411, 2011-Ohio-5262, 958 N.E.2d 1203, ¶ 18. *Westerfield v. Three Rivers Nursing and Rehab. Ctr., L.L.C.*, 2d Dist. Montgomery No. 25347, 2013-Ohio-512, ¶ 16-17.

**{¶ 31}** R.C. 2711.02(B) provides:

If any action is brought upon any issue referable to arbitration under an agreement in writing for arbitration, the court in which the action is pending, upon being satisfied that the issue involved in the action is referable to arbitration under an agreement in writing for arbitration, shall on application of one of the parties stay the trial of the action until the arbitration of the issue has been had in accordance with the agreement, provided the applicant for the stay is not in default in proceeding with arbitration.

**{¶ 32}** "The arbitrability of a claim is a question of law, which we review de novo. * * * ." *Westerfield*, ¶ 19.

**{¶ 33}** As this Court previously noted:

In assessing the reach of the parties' arbitration clause, we are guided by four principles, originally applied in the collective bargaining context, that have gained widespread use in evaluating agreements to arbitrate. *Council of Smaller Enterprises v. Gates*, 80 Ohio St.3d 661, 665, n. 1, 1998-Ohio- 172. First, "'arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.'" *Id*. at 665, 687 N.E.2d 1352, quoting *AT&T Technologies*, *Inc. v. Communications Workers of Am.* (1986), 475 U.S. 643, 648-649, 106 S.Ct. 1415, 89 L.Ed.2d 648. Second,

unless the parties provide otherwise, "'the   question of arbitrability - whether a[n] * * * agreement creates a duty for the parties to arbitrate the particular grievance - is undeniably an issue for judicial determination.'"  *Id.* at 666, quoting *AT&T Technologies* at 649.   Third, "'in deciding whether the parties have agreed to submit a particular grievance to arbitration, a court is not to rule on the potential merits of the underlying claims.'" *Id.*   Fourth, "where the contract contains an arbitration clause, there is a presumption of arbitrability in the sense that '[a]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.'"  *Id.*, quoting *AT&T Technologies* at 650.   In other words, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration[.]" *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24-25, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983); see also *Gaffney v. Powell* (1995), 107 Ohio App.3d 315, 320, 668 N.E.2d 951 (recognizing that "[a]mbiguities as to the scope of the arbitration clause itself should be resolved in favor of arbitration"); *Artex Oil Co. v. Energy Sys. Management of Ohio,* Noble App. No. 292, 2002-Ohio-5244 (noting that "an arbitration clause should be enforced unless the court is firmly convinced that it is inapplicable to the dispute in question"). *McManus v. Eicher*, 2d Dist. Greene No. 2003-CA-30, 2003-Ohio-6669, ¶ 11.

**{¶ 34}**   The matter herein implicates the first and fourth principles cited above, which establish that KHN cannot be required to submit its claims to arbitration if it has not agreed to do

so, and that "any doubt should be resolved in favor of arbitration." *McManus*, ¶ 12.

{¶ 35}    As this Court further noted in *Westerfield*:

When reviewing a contract, the court's primary role is to ascertain and give effect to the intent of the parties. * * * A contract that is, by its terms, clear and unambiguous requires no real interpretation or construction and will be given the effect called for by the plain language of the contract. * * * A contract is ambiguous if its provisions are susceptible to two or more reasonable interpretations. * * * "If an ambiguity exists in a contract, then it is proper for a court to consider 'extrinsic evidence,' i.e., evidence outside the four corners of the contract, in determining the parties' intent. * * * Such extrinsic evidence may include (1) the circumstances surrounding the parties at the time the contract was made, (2) the objectives the parties intended to accomplish by entering into the contract, and (3) any acts by the parties that demonstrate the construction they gave to their agreement. * * * ." *Id*., ¶ 21-22.

As this Court noted in *Garcia*, upon which the trial court relied, the presumption in favor of arbitration remains intact "unless there exists the most forceful of evidence of a purpose to exclude the claim from arbitration." *Id*., *9.

{¶ 36}    We initially note that we agree with the trial court's determination that it is "indisputable that all claims between the parties that arose subsequent to the 2005 Agreement are to be arbitrated in accordance with Article 7.11 of the 2005 Agreement."    We additionally agree with the trial court's determination that since the 1987 Agreement does not contain an arbitration clause, the 1987 Agreement is not entitled to an "*isolated,*"  or separate, presumption in favor of

arbitration. We further agree with the trial court's determination that the arbitration provision in Article 7.11 of the 2005 Contract, which covers "complaints, grievances or disputes arising between the parties," and which is not date-specific, is a "broad" provision. (*Compare* Article 7.11 of the 2005 Contract to the narrow arbitration provision in *McManus*, "limited to issues of contract interpretation," which provided: "'[i]f any dispute shall arise relative to the interpretation of this Agreement, the dispute shall be submitted to arbitration[.]'" *Id.*, ¶ 13.)

{¶ 37}     We note that the trial court, having found "there to be doubt surrounding the parties' intentions as to the retroactive effect of Article 7.6 of the 2005 Agreement," properly considered extrinsic evidence, namely the Haibach and Roberts affidavits.   We note that Roberts avers generally, and somewhat vaguely, that she has "personal knowledge of past and existing contracts" between the parties, and that she authenticated two exhibits which purportedly set forth KHN's claims of unpaid charges that arose prior to, and subsequent to, the effective date of the 2005 Agreement.   Haibach's affidavit generally provides that his "understanding," as well as the "understanding" of the unidentified   "contract negotiating team," was that Article 7.6 of the 2005 Agreement "applied to matters beginning July 1, 2005 and thereafter but not prior thereto," and that Article 7.11 "was intended to apply to claims for services rendered under the new contract."

{¶ 38} We agree with the trial court that the general averments contained in the affidavits do not constitute "'the most forceful evidence of a purpose to exclude the claim[s] from arbitration.'"   In other words, the affidavits do not constitute the emphatic type of evidence required to overcome KHN's heavy burden to rebut Ohio's strong presumption in favor of arbitration.

{¶ 39}   Based upon the foregoing, we conclude, as did the trial court, that Article 7.6 of the 2005 Agreement is reasonably susceptible to CareSource's interpretation that its effect is retroactive such that Article 7.11 of the 2005 Agreement supersedes the 1987 Agreement. This conclusion is supported by the fact that Article 7.6 of the 2005 Agreement, entitled "Entire Agreement," expressly provides that it "*supersedes* all other agreements * * * *regarding the subject matter hereof.*"   Article 7.6 of the 1987 Agreement also provides that the Agreement and Exhibits "constitute the entire agreement between the parties *regarding the subject matter hereof*," and KHN in its complaint asserts that both "the 1987 Contract and the 2005 Contract have consistently and expressly required CareSource to pay [KHN] for outpatient services in amounts equivalent to the then-prevailing Ohio Medicaid rates."   In other words, while KHN asserts that the subject matter of the 2005 Agreement encompasses "all claims arising on the effective date and into the future," Article 7.6 of the 2005 Agreement is susceptible to an interpretation that the subject matter of both agreements is the same, such that Article 7.11 of the 2005 Agreement supersedes the 1987 Agreement.   Accordingly, as did the trial court, we resolve any doubt regarding the application of Article 7.11 of the 2005 Agreement in favor of arbitration.

{¶ 40}   There being no merit to KHN's assigned error, it is overruled, and the judgment of the trial court is affirmed.

. . . . . . . . . .

FROELICH, P.J. and HALL, J., concur.

Copies mailed to:

Gary J. Leppla
Philip J. Leppla
Mark R. Chilson
Andrew J. Reitz
Hon. Dennis J. Langer